**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DANIEL LEVY, | ) | |
| | ) | |
| **Plaintiff** | ) | **Civil Case No.:**  8:15-CV-1252 (GTS/CFH) |
| | ) | |
| **vs.** | ) | **COMPLAINT** |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| NEW YORK STATE DEPARTMENT | ) | |
| OF ENVIRONMENTAL CONSERVATION, | | |
| Marc Gerstman, in his capacity as Acting DEC | | |
| Commissioner, Tom Martin, Kris Alberga, and | | |
| Robert Daley, | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiff Daniel Levy ("Plaintiff" or "Levy"), by and through his attorneys, Disability

Rights New York, for his complaint against the  New York State Department of Environmental

Conservation ("DEC"), Marc Gerstman, Tom Martin, Kris Alberga, and Robert Daley

(collectively referred to as "Defendants"), alleges as follows:

## NATURE OF ACTION

1.      Plaintiff Levy is a capable and experienced forester who has diabetes, a hearing

impairment, and a learning disability.  In 2007, several years after he began his employment,

Defendant DEC's Bureau of Affirmative Action ("BAA") granted Levy various reasonable

accommodations for his disabilities, in writing.  Beginning in 2010 and with increasing

frequency, Defendants no longer provided the accommodations which would have allowed Levy

to effectively manage his glucose levels and to understand instructions.    Defendants then

retaliated against Levy for asserting his right to reasonable accommodation  by restricting his

physical activity, removing access to equipment, removing forest management responsibilities,

issuing unfounded disciplinary counseling memoranda and unsatisfactory performance evaluations, and denying him promotions for which he was well qualified.

2.      Levy brings this action against DEC and Gerstman for violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA") and Section 504 of the Rehabilitation Act ("Rehabilitation Act"), and against defendants Martin, Alberga and Daley for violations of the New York State Human Rights Law ("NYHRL").  Levy seeks an injunction requiring that the reasonable accommodations to which he is entitled be provided, compensatory and punitive damages, lost wages and benefits, attorneys' fees and other appropriate relief.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over Levy's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Levy's state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue lies in the Northern District of New York pursuant to 28 U.S.C. § 1391(b). The alleged unlawful employment practices occurred within this District.

## PARTIES

5.      Plaintiff Levy resides in Saranac Lake, New York.

6.      Defendant DEC is a state environmental protection agency with over fifteen employees in nine regional offices throughout the state of New York.  DEC's central office is located at 625 Broadway, Albany, NY 12233.

7.      DEC receives federal financial assistance from the United States Environmental Protection Agency, the U.S. Department of Energy, and the U.S. Department of Agriculture.

8.      DEC was Levy's "employer" within the meaning of the ADA, Rehabilitation Act, and NYHRL.

9.      Defendant Marc Gerstman ("Gerstman") is the current Acting Commissioner of the NYS DEC. His office address is 625 Broadway, Albany, NY 12233.

10.     Defendant Tom Martin ("Martin") was a Forester 3 until 2012 when he became Regional Natural Resource Supervisor for DEC's Region 5.  Martin was in Levy's chain of supervisory authority during all relevant time periods.  Martin's office address is 1115 NYS Route 86, Ray Brook N.Y., 12977.

11.     Defendant Kris Alberga ("Alberga") was Levy's supervisor until 2012 when he became a Forester 3.  Alberga was in Levy's chain of supervisory authority during all relevant time periods.  Alberga's office address is 1115 NYS Route 86, Ray Brook N.Y. 12977.

12.     Defendant Robert Daley ("Daley") has been a Forester 2 and Levy's  supervisor since May 2012.  Daley's office address is 1115 NYS  Route 86, Ray Brook N.Y. 12977.

13.     Martin, Alberga, and Daley each function and have functioned as Levy's "employer" within the meaning of the NYHRL.


**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

14.     Levy filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") on March 26, 2014 and amended charges on September 19, 2014 and January 22, 2015, complaining of the unlawful discriminatory acts alleged herein.

15.     Levy received a determination letter and Notice of Right to Sue from the EEOC on July 23, 2015.

16.     This complaint is timely filed within 90 days of the EEOC's Notice of Right to Sue.

**FACTS**

17.     Levy began working for the DEC as a Forester 1 trainee in its Region 6 office in 2000.

18.     Since 2002, Levy has worked as a Forester 1 in the DEC's Division of Lands and Forests at its Region 5 office in Ray Brook, NY.

19.     Levy's job duties as a Forester 1 include developing and implementing management plans for public lands managed by DEC, creating inventories of natural resources, conducting inspections for federal and state forest management programs for landowners, educating and advising forest owners and administrators about relevant management protocols, and implementing and enforcing native plants regulations.

20.     In the DEC field offices, a Forester 1's duties customarily and consistently require a combination of office work and field work activities.

21.     To safely manage his diabetes, Levy must eat when needed, inject insulin when needed, at times use the bathroom frequently, and engage in regular physical activity.  He needs some job assignments that require physical activity, extra breaks for physical exercise when performing sedentary job functions, and sufficient flexibility in his work schedule to allow for glucose management.

22.     For his hearing impairment and learning disability, Levy requires clear, written instructions with clarifying feedback.  For his hearing impairment, Levy needs a telephone with volume control.

23.     Because of his learning disability, Levy requires checks for grammar and organization in drafts for large written products such as Unit Management Plans ("UMP").

24.     When Levy was a trainee and Forester 1 in DEC's Region 6, Levy's supervisor Bernard Davies granted his accommodation requests between 2000 and 2002.

25.     After Levy transferred to a Forester 1 position in Region 5, his supervisor Peter Grupe also granted his requests.

26.     In  2004, after Alberga became his supervisor, Levy began having difficulties obtaining the necessary reasonable accommodations.

27.     Levy tried unsuccessfully to obtain the necessary reasonable accommodations from Martin and Alberga over the next three years.

28.      In the spring of 2007, Levy formally requested reasonable accommodations through the DEC's Bureau of Affirmative Action (BAA) of: (1) work breaks with walking, (2) to eat, test his blood, and inject insulin when needed, (3) use of a food storage area, (4) to use the bathroom when needed, (5) varied work assignments depending upon glucose levels, (6) outdoor work assignments with physical activity, (7) flexible scheduling, (8) minimized stress in workplace interactions, (9) clear instructions with opportunity for clarification, (10) written confirmation of verbal assignments, (11) the ability to take notes of assignments, and (12) a telephone with volume control and clear reception.

29.     Levy supplied supporting documentation from his physician, endocrinologist, and a neuropsychological evaluation.

30.     DEC, through its BAA Director Juan Abadia ("Abadia") granted all of Levy's requests by way of a written memorandum dated May 22, 2007, noting in the memorandum that

the BAA "has received sufficient and appropriate medical documentation for Mr. Levy to validate this request."

31.     At first, Levy received the granted accommodations.

32.     However, beginning in 2010, Alberga increased Levy's office-based assignments and decreased his outdoor fieldwork, which was a major source of Levy's physical activity. Alberga assigned fieldwork activities to other Forester 1's and not to Levy.

33.     As a result of the reduced physical activity, Levy had increasing difficulty with managing his glucose levels.

34.     Levy repeatedly reminded Alberga of his need for outdoor job assignments that would require physical activity in order to accommodate his disability, but Alberga refused to reinstate the activities.

35.     Alberga also refused to provide Levy with written instructions. On multiple occasions from 2010 until the spring of 2012, when Levy tried to confirm or clarify verbal instructions, Alberga responded that Levy asked too many questions.  Rather than accommodating Levy's disabilities, Alberga criticized him in performance reviews for requiring more supervision than other Forester 1's.

36.     When refusing to accommodate him, Alberga complained to Levy several times that he is "different," and that Alberga did not have to repeat instructions, modify a schedule, or assign active fieldwork for anyone else (though other foresters did receive fieldwork assignments and were allowed to modify their schedules).

37.     During one of these discussions, Alberga threatened to punch Levy.

38.     In May 2012, Daley was promoted to Forester 2 and became Levy's supervisor. Daley was supervised by Alberga, who was promoted to a Forester 3.

39.     Also in May 2012, Martin became Regional Natural Resource Supervisor, and assumed management responsibilities for all natural resource divisions in Region 5.  Martin continued to supervise Alberga.

40.     Beginning in the summer of 2012, DEC refused to allow Levy to vary his work assignments to allow for necessary physical activity. Instead, Daley and Alberga assigned Levy unreasonably short deadlines to revise UMP's.  The deadlines were shorter than those provided to other employees with similar work assignments.

41.     The lack of physical activity and short deadlines increased Levy's stress and blood glucose levels.

42.     The arbitrary deadlines imposed upon him were not necessary, since neither Daley nor Alberga reviewed the UMP drafts for at least several months after Levy provided them.

43.     In July 2012, Levy reminded Daley that he had been granted reasonable accommodations in May 2007, which included physically active work assignments and the ability to adjust his schedule.

44.     Daley claimed to have no knowledge of Levy's May 2007 accommodations.

45.     Levy tried contacting Abadia for assistance with compliance with the May 2007 accommodations.   In July and August 2012, Levy left Abadia several telephone messages which were not returned.

46.     In September 2012, Levy wrote a letter to Abadia complaining about his supervisors' lack of compliance with his reasonable accommodations. Abadia never responded to Levy's letter.

47.     In or about January 2013, Daley assigned Levy a large and complex UMP.  At the time, Levy was already responsible for completing five other UMP's.   Levy was already assigned more UMP's than any other Forester 1 in the Ray Brook office.

48.     In or about March 2013, Daley told Levy that the deadline for the initial team draft for the new UMP would be September 6, 2013.  Levy responded that the deadline was not reasonable and that he could not possibly meet it.

49.     Daley advised Levy to do his best and to make sure the State Forest section of the plan was completed first.

50.     Over the next several months, Daley assigned Levy's ongoing outdoor assignments to other foresters, leaving Levy with little opportunity for fieldwork and associated physical activity.

51.     The transferred assignments included fieldwork responsibilities for implementing UMPs that Levy had developed and customarily would be expected to implement.

52.     Normally, a Forester 1 carries responsibility for implementing the unit management plans decisions he has developed.  This fieldwork would have provided activity that Levy needed to manage his diabetes.

53.     In July 2013, Daley told Levy that he needed to be in the office at all times writing UMP drafts.    Daley said if Levy needed anything else to do, he could complete timber orders in the office.

54.     Levy reminded Daley that he needed physically active work assignments in order to manage his diabetes.  Levy told Daley that refusal to allow him to have physically active work was illegal and violated his rights.  Levy explained that he needed physically active work for his health, and restricting him to office work violated the accommodations he had been granted.

8

55.     Daley asked for medical documentation to support Levy's need for accommodations.

56.     Levy told  Daley that he should speak with Abadia.  Daley stated that he would schedule a meeting with Abadia.

57.     About a week later, on July 23, 2013, Daley issued Levy a disciplinary counseling memo claiming that Levy had cut trees with a chainsaw in an unsafe manner in violation of DEC policy and Daley's instructions.  Daley forbade Levy from using a chainsaw until further notice.

58.     This was the first counseling memo that Levy had received in thirteen years criticizing his work performance.

59.     Levy explained to Daley that he had followed Daley's instructions, that he had not been alone using the chainsaw, and that he had not violated DEC policy.

60.     When Levy asked Daley to explain why he should be restricted from using a chainsaw, Daley told Levy that it was unsafe for diabetics to run chainsaws.

61.     Subsequently, on August 13, 2013, Daley ordered Levy not to use any motorized equipment without specific approval.

62.     Daley also refused to allow Levy schedule adjustments that Levy needed to manage his diabetes.   Unlike other foresters, Levy was only permitted a schedule adjustment if he provided two weeks' prior notice to Daley.

63.     On August 16, 2013, Abadia met with Daley and Martin regarding Levy's accommodations.

64.     Abadia informed Levy that management would not comply with the granted accommodations requiring physical activity.  Abadia suggested instead Levy use a treadmill at his desk during the workday.

9

65.     Levy responded that including fieldwork tasks in his work activities would be much more effective.  He would be getting hours of vigorous activity during the course of performing his duties in the field, and this had enabled him to successfully control his glucose levels in the past.   By contrast, in his office he would not be able to perform office duties such as typing or using the phone while running on a treadmill.

66.     Levy was concerned that he would not work efficiently while using the treadmill, and would be counseled for failing to complete his work.

67.     Levy told Abadia that other Foresters 1's have fieldwork and he just wanted to be treated like the other Foresters.

68.     Abadia asked Levy for a letter explaining why the accommodations were needed in order to help persuade management.

69.     On September 4, 2013, counsel for Levy provided the requested letter.

70.     The September 4, 2013 letter also asked that Levy be granted access to an administrative assistant to review writing drafts, in order to reasonably accommodate Levy's learning disability. The assistant was already performing such work for other DEC staff, and had reviewed  Levy's written drafts at Alberga's request in or about 2011 and 2012.

71.     After receiving the letter, Abadia requested updated medical information regarding Levy's diabetes.  Levy provided an updated letter from his endocrinologist on or about September 23, 2013.

72.     DEC did not respond to Levy's request for access to the administrative assistant, or suggest any other potentially effective accommodations.

73.     On or about October 10, 2013, Levy notified Daley that he would be interviewing for a Forester 2 position, which would have been a promotion, in the DEC's Region 4 Stamford Office on October 17, 2013.

74.     Daley and Alberga issued Levy an unsatisfactory performance evaluation dated October 16, 2013, one day before Levy's interview.

75.     Alberga and Daley issued the evaluation six months early, in violation of the Public Employee's Federation (PEF) union contract.  The union contract requires a six-month recertification in order to notify the employee of performance issues and provide an opportunity for correction prior to the annual evaluation.

76.     This was the first unsatisfactory performance evaluation Levy had received in thirteen years as a DEC Forester 1.

77.     The evaluation falsely accused Levy of providing inaccurate information, engaging in unsafe work practices, and performing tasks that were not assigned to him.  Levy was criticized for failing to meet the September 6, 2013 UMP team draft deadline which had been impossible to meet.

78.     The evaluation also criticized Levy for grammatical and other drafting errors, despite the fact that he had requested editorial support as a reasonable accommodation in September 2013.

79.     Alberga and Daley also issued Levy a 2013-14 performance plan that included no outdoor assignments. Alberga and Daley removed unit management plan implementation and recreation management activities from Levy's work plan.

80.     When Levy objected, Alberga responded that the new plan was "non-negotiable" and that the plan had been approved by the highest levels at DEC.

81.     On November 7, 2013, Levy was informed that he was not selected for the Forester 2 position.  Another Forester 1 was offered the position despite receiving a lower score than Levy on the state civil service promotional examination.

82.     Upon information and belief, Levy was turned down for the Forester 2 position because of his unsatisfactory rating, and because of references from his supervisors that were critical of his job performance.

83.     The alleged criticisms were not legitimate, and instead were pretext for discriminatory and retaliatory animus.

84.     On November 19, 2013, DEC's Director of Personnel notified Levy that his unsatisfactory rating had been overturned for its technical deficiencies, including the violation of the PEF union contract.

85.     Although the rating was overturned, the evaluation remains in Levy's personnel file.

86.     In November 2013, Levy interviewed for a Forester 2 position in the Region 5 Warrensburg office.  Alberga and Martin interviewed Levy and did not offer him the position, despite Levy's seniority.

87.     In the meantime, DEC took no action to enforce compliance with the 2007 accommodations.  To the contrary, the restrictions on Levy's activities only worsened.

88.     On December 20, 2013, Daley, with no legitimate justification, forbade Levy from engaging in any fieldwork activities without specific approval.

89.     That week Daley also forbade Levy from using a snowmobile, confirming that the August 2013 prohibition against using motorized equipment was still in effect.

90.     Other foresters in Levy's office continued to engage in outdoor fieldwork, while Levy was forced to work only at his desk. Other foresters also used chainsaws and motorized equipment as needed, without having to seek approval from Daley.

91.     Daley followed this instruction with a counseling session and a punitive counseling memo dated February 11, 2014, falsely accusing Levy of insubordination.  The counseling session and memo had no legitimate basis.

92.     Levy, through his union, filed a grievance regarding the counseling memo. Ultimately in May 2014, DEC's Office of Employee Relations  ruled that DEC had to expunge the punitive memo because it failed to comply with the Public Employees' Federation contractual principles regarding employee counseling.

93.     As a result of the lack of physical activity, and the stress from DEC's disregard of his accommodations, and the retaliation, Levy repeatedly took sick leave to manage high glucose levels and protect his health.

94.     Daley also failed to consistently confirm Levy's work assignments in writing. On February 27, 2014, Abadia instructed Daley to purchase a tape recorder for Levy so that Levy could record verbal instructions.

95.     Since Levy received the tape recorder, Daley repeatedly issued verbal instructions to Levy without warning, and walked away before Levy could begin recording.

96.     While the tape recorder would be helpful if Levy could record instructions, it is not a wholly effective accommodation. Even with recorded instruction, Levy still needs written confirmation of instructions because of his disabilities.

97.     DEC failed to respond to Levy's request for access to the administrative assistant, despite receiving an updated neuropsychological report describing his learning disability on January 8, 2014.

98.     On March 14, 2014, Daley curtailed Levy's legitimate use of sick leave to manage his diabetes. Although no other DEC employee was required to obtain advance permission before leaving work in the event of illness, Daley notified Levy that before he used sick leave, he must first obtain permission from a supervisor.

99.     Instead of implementing the 2007 accommodations for outdoor physical activity, in March 2014 DEC offered to transfer Levy to a Forester 1 position in a tree nursery.

100.    Levy rejected this position because it is largely sedentary, would expose him to dust and pesticides, would provide him none of the responsibilities for land management that he enjoyed in his current position, and would continue to subject him to the same chain of command of Alberga and Martin.

101.    In April 2014, Levy received reports from his doctors that his average glucose levels had reached dangerous all-time highs during the prior six months. Levy also experienced increased blurred vision and damage to the blood vessels in his eyes.

102.    This evidence of health risks brought renewed urgency to reestablish regular physical activity into Levy's work and reduce the level of undue stress he endured daily at his job.

103.    Levy's attorney notified DEC that immediate action must be taken to integrate long periods of physical activity into Levy's work schedule. Levy's attorney threatened to move for preliminary injunctive relief in federal court if DEC refused to do so.

14

104.    On May 2, 2014, Levy and his attorney met with Abadia and Defendant's attorney Phil Lodico. DEC agreed that Levy would engage in fieldwork activities for at least two days a week for the foreseeable future.

105.    DEC also agreed that Levy would also be allowed to take his meal break at the end of the work day if necessary for medical reasons and that subject to a check with her supervisor, the administrative assistant would be made available to review Levy's UMP drafts.

106.    The fieldwork accommodations were short-lived.  By August 2014, Levy again was given no field work activities and was forced to use sick leave to manage his high glucose levels.

107.    Levy's annual work plans fail to include any responsibilities that would require physical activity, such as unit management plan implementation, forest or recreation management activities.

108.    DEC also reneged on the decision to allow Levy to take his meal break at the end of the day if needed for medical reasons.  Daley issued a memo dated August 15, 2014 stating that after six hours of work, Levy must take a meal break at least one half hour before the end of his workday.

109.    Thus, if Levy needs to leave work early to take sick leave, he must first take a half hour lunch break and remain at work another half hour before leaving.

110.    DEC also refused to make the administrative assistant available and failed to offer any alternative accommodation for draft review.

111.    On December 9, 2014, Abadia sent Levy a letter stating that neither the letter from his endocrinologist nor the neuropsychologist's report made any connection between his disability and the requested accommodations.

112.     Abadia sent this letter **fifteen months** after receiving the September 23, 2013 letter from Levy's endocrinologist, and nearly a year after receiving the neuropsychologist's report.

113.     Levy provided additional documentation from his endocrinologist supporting his need for strenuous physical activity at least twice a week during work hours.

114.     Levy obtained and submitted an addendum from his neuropsychologist specifically supporting his request for editorial assistance.

115.     DEC has continued to refuse to implement the requested accommodations and failed to offer any other effective accommodations.  Instead, Levy remains at his desk while other foresters are in the field.

116.     Daley has continued to cite Levy for grammatical errors in writing drafts in performance reviews on May 12, 2014 and November 12, 2014, and fails to confirm any instructions in writing.

117.     On May 12, 2014 DEC's Office of Employee Relations ordered the February 14, 2014 counseling memo expunged because it violated the PEF union contract, which requires that counseling of employees be constructive and non-punitive. Daley issued Levy the identical punitive counseling memo on June 5, 2014, except that the term "failure to follow directions" was substituted for "insubordination."

118.     On May 12, 2014 Daley issued Levy an "unsatisfactory rating" for his work performance for the annual midpoint rating period. The rating was without any legitimate basis, and ignored several of Levy's accomplishments, including a 400 page working draft of a UMP covering a highly complex unit and an initial draft of a State Forest Management Plan.

119.    On August 15, 2014, Alberga and Martin interviewed Levy for a Forester 2 position in Region 5's Northville office.

120.    On August 28, 2014, Alberga notified Levy that he was denied the promotion to Forester 2.  DEC offered the position to a Forester 1 who received a lower score than Levy on the state civil service promotion exam.

121.    On November 12, 2014, Levy's supervisor Daley issued Levy a 2013-2014 performance evaluation and 2014-2015 work plan.

122.    While Levy received a satisfactory rating, Daley again cited Levy's writing as a performance deficiency, and criticized his performance without providing any examples of his alleged deficiencies.  Daley again omitted Levy's significant accomplishments on his performance evaluation.

123.    Despite the challenges of his learning disability and DEC's lack of accommodations, Levy produces high quality and detailed unit management plans.   The highest levels of DEC administration as well as the Adirondack Park Agency have praised Levy's work.

124.    In April 2015, Levy received a top score on the New York State Department of Civil Service statewide promotional examination for Forester 2's, including his preparation of written material.

125.     Despite his qualifications for the job, on August 27, 2015, DEC denied Levy another promotion to Forester 2 in the DEC's Region 7 Cortland office.

126.    The retaliatory counseling notices remain in Levy's personnel file and the Personnel Office may disclose summaries of the notices to inquiring supervisory staff.

127.     The negative performance evaluations are evidence of Levy's supervisors' discriminatory animus which, upon information and belief, they share with supervisors from other DEC district offices who are considering Levy for a position.

128.     On June 5, 2015, Daley again denied Levy use of a chainsaw, as well as an all-terrain vehicle, confirming that the prohibitions against his use of equipment are still in effect.

## FIRST CAUSE OF ACTION

### Americans with Disabilities Act – Disability Discrimination

### (Against Defendants DEC and Gerstman)

129.     Plaintiff Levy incorporates and realleges each preceding paragraph as if fully set forth herein.

130.     Levy has Type 1 diabetes, a hearing impairment, and a learning disability, all of which qualify as protected disabilities under the ADA.

131.     Levy's diabetes, hearing impairment, and learning disability substantially limit the major life activities of endocrine function, hearing, and learning, respectively.

132.     Levy can perform the essential functions of his job with reasonable accommodations for his disabilities.

133.     Defendants discriminated and continue to discriminate against Levy by refusing to make reasonable accommodations for his known disabilities.

134.     Defendants discriminated and continue to discriminate against Levy by taking adverse action against him in regard to the terms, conditions, or privileges of his employment on the basis of his disabilities.

18

135.    Defendants discriminated against Levy by issuing disciplinary counseling memoranda and unsatisfactory and/or negative performance evaluations on the basis of his disabilities.

136.    The proffered reasons for disciplinary counseling and negative performance evaluations are not legitimate, and are pretext for discriminatory animus.

137.    Defendants refused to promote Levy to Forester 2 positions because of discriminatory animus.

138.    Defendants' conduct was with malice or reckless indifference for Levy's federally protected ADA rights.

## SECOND CAUSE OF ACTION

### Americans with Disabilities Act – Retaliation

### (Against Defendants DEC and Gerstman)

139.    Plaintiff Levy incorporates and realleges each preceding paragraph as if fully set forth herein.

140.    As a result of Levy's efforts  in July 2013 to achieve compliance with the granted reasonable accommodations, his efforts at achieving compliance through the BAA, and his filing of the EEOC charge, defendants retaliated against Levy by refusing to make reasonable accommodations for his known disabilities.

141.    Defendants retaliated and continues to retaliate against Levy by taking adverse action against him in regard to the terms, conditions, or privileges of his employment.

142.    Defendants have retaliated against Levy by issuing disciplinary counseling memoranda and unsatisfactory and/or negative performance evaluations.

143.    The proffered reasons for disciplinary counseling and negative performance evaluations were not legitimate, and were pretext for retaliatory animus.

144.    Defendants refused to promote Levy to Forester 2 positions because of retaliatory animus.

145.    Defendants' conduct was with malice or reckless indifference for Levy's federally protected ADA rights and in violation of 42 U.S.C. §12203.


**THIRD CAUSE OF ACTION**

**Rehabilitation Act – Disability Discrimination**

**(Against Defendant DEC)**

146.    Levy incorporates and realleges each preceding paragraph as if set forth fully herein.

147.    DEC receives Federal financial assistance under Section 504 of the Rehabilitation Act.

148.    Levy has Type 1 diabetes, a hearing impairment, and a learning disability, all of which qualify as protected disabilities under the Rehabilitation Act.

149.    Levy's diabetes, hearing impairment, and learning disability substantially limit the major life activities of endocrine function, hearing, and learning, respectively.

150.    Levy can perform the essential functions of his job with reasonable accommodations for his disabilities.

151.    DEC discriminated and continues to discriminate against Levy by refusing to make reasonable accommodations to his known disabilities.

152.    DEC discriminated and continues to discriminate against Levy by taking adverse action against him in regard to the terms, conditions, or privileges of his employment on the basis of his disabilities.

153.    DEC discriminated against Levy by issuing disciplinary counseling memoranda and unsatisfactory and/or negative performance evaluations on the basis of his disabilities.

154.    The proffered reasons for disciplinary counseling and negative performance evaluations are not legitimate, and are pretext for discriminatory animus.

155.    DEC refused to promote Levy to Forester 2 positions because of discriminatory animus.

**FOURTH CAUSE OF ACTION**

**Rehabilitation Act – Retaliation**

**(Against Defendant DEC)**

156.    Plaintiff Levy incorporates and realleges each preceding paragraph as if fully set forth herein.

157.    As a result of Levy's efforts in July 2013 to achieve compliance with the granted reasonable accommodations, his efforts at achieving compliance through the BAA, and his filing of the EEOC charge, DEC has retaliated against Levy by refusing to make reasonable accommodations for his known disabilities.

158.    DEC retaliated and continues to retaliate against Levy by taking adverse action against him in regard to the terms, conditions, or privileges of his employment on the basis of his disabilities.

159.    DEC retaliated against Levy by issuing disciplinary counseling memoranda, unsatisfactory and/or negative performance evaluations, and by interfering with Levy's efforts at promotion.

160.    The proffered reasons for disciplinary counseling and negative performance evaluations were not legitimate, and were pretext for retaliatory animus.

161.    DEC refused to promote Levy to Forester 2 positions because of retaliatory animus.

## FIFTH CAUSE OF ACTION

### New York State Human Rights Law – Disability Discrimination

### (Against Defendants Martin, Alberga and Daley )

162.    Plaintiff Levy incorporates and realleges each preceding paragraph as if fully set forth herein.

163.    Levy has Type 1 diabetes, a hearing impairment, and a learning disability, all of which qualify as disabilities as defined by the NYHRL, N.Y. Executive Law § 292(21).

164.    Levy can perform the essential functions of his job with reasonable accommodations for his disabilities.

165.    Defendants discriminated and continue to discriminate against Levy by refusing to make reasonable accommodations to his known disabilities in violation of N.Y. Executive Law § 296.

166.     Defendants discriminated and continue to discriminate against Levy by taking adverse action against him in the terms, conditions, or privileges of his employment on the basis of his disabilities.

167.     Defendants discriminated against Levy by issuing disciplinary counseling memoranda and unsatisfactory and/or negative performance evaluations on the basis of his disabilities.

168.     The proffered reasons for disciplinary counseling and negative performance evaluations are not legitimate, and are pretext for discriminatory animus.

169.     Defendants refused to promote Levy to Forester 2 positions because of discriminatory animus.

170.     Upon information and belief, Martin, Alberga and Daley interfered with Levy's efforts at promotion in Region 4 in October 2013 and Region 7 in August 2015 because of discriminatory animus.

171.     Martin, Alberga and Daley participated in the discriminatory conduct against Levy.

172.     During all relevant time periods, Martin, Alberga and Daley held and hold managerial and supervisory job positions at DEC.

173.     Daley, Alberga and Martin aided and abetted the discrimination against Levy.

## SIXTH CAUSE OF ACTION

### New York State Human Rights Law – Retaliation

### (Against Defendants Martin, Alberga and Daley)

174.    As a result of Levy's opposition to his supervisors in July 2013 to achieve compliance with the granted reasonable accommodations, his efforts at achieving compliance through the BAA, and his filing of the EEOC charge, Defendants retaliated against Levy by refusing to make reasonable accommodations for his known disabilities.

175.    Defendants retaliated and continue to retaliate against Levy by taking adverse action against him in regard to the terms, conditions, or privileges of his employment on the basis of his disabilities.

176.    Defendants retaliated against Levy by issuing disciplinary counseling memoranda, unsatisfactory and/or negative performance evaluations, and by interfering with Levy's efforts at promotion.

177.    The proffered reasons for disciplinary counseling and negative performance evaluations were not legitimate, and were pretext for retaliatory animus.

178.    Defendants refused to promote Levy in November 2013 and August 2014 for Region 5 Forester 2 positions because of retaliatory animus.

179.    Upon information and belief, Defendants interfered with Levy's efforts at promotion in Region 4 in October 2013 and Region 7 in August 2015 because of retaliatory animus.  Their efforts succeeded in preventing his promotion to Forester 2 positions.

180.    Martin, Alberga and Daley participated in the retaliatory conduct  against Levy.

181.    During all relevant time periods, Martin, Alberga and Daley held and hold managerial and supervisory job positions at DEC.

182.    Daley, Alberga and Martin aided and abetted the retaliation against Levy.


**PRAYER FOR RELIEF**

WHEREFORE, Levy respectfully requests that this Court enter a judgment:

A. Declaring that Defendants' actions and practices violated the ADA, Rehabilitation Act and the NYHRL.

B. Permanently enjoining Defendants from engaging in actions or practices that discriminate against Levy and any employees because of their disability, and from retaliating against Levy and any employees for exercising their protected rights under the ADA, Rehabilitation Act and the NYHRL.

C. Ordering Defendants to implement all previously granted and currently requested reasonable accommodations;

D. Ordering Defendants to reinstate lost sick leave benefits in an amount to be determined;

E. Awarding damages to Levy so as to make him whole for all earnings and benefits he would have received but for Defendants' unlawful conduct, including but not limited to wages, lost benefits, and interest thereon;

F. Awarding compensatory damages, including damages for emotional distress and physical deterioration proximately caused by Defendant's unlawful conduct;

G. Award costs, disbursements, and attorneys' fees.

H. Award any other relief which the Court deems just and proper.

## JURY DEMAND

Levy demands a trial by jury on all claims properly triable by jury.


Dated: October 20, 2015                    DISABILITY RIGHTS NEW YORK
       Albany, New York


                                           By:    ___/s/_____
                                                  Nina Loewenstein
                                                  Bar Roll No. 511043

                                                  Elizabeth Grossman
                                                  Bar Roll No. 105554

                                                  Simeon Goldman
                                                  Bar Roll No. 505264

                                                  725 Broadway, Suite 450
                                                  Albany, NY 12207
                                                  (518) 432-7861