UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DANIEL LEVY,

                Plaintiff,

v.                                                                      8:15-CV-1252
                                                                        (GTS/CFH)
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION;
MARC GERSTMAN, Acting DEC Commissioner;[1]
TOM MARTIN; KRIS ALBERGA; and ROBERT
DALEY,

                Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

LENOX HILL NEIGHBORHOOD HOUSE             ELIZABETH GROSSMAN, ESQ.
  Counsel for Plaintiff
331 East 70th Street
New York, New York 10021

DISABILITY RIGHTS NEW YORK                   NINA LOEWENSTEIN, ESQ.
  Co-counsel for Plaintiff                              SIMEON L. GOLDMAN, ESQ.
725 Broadway, Suite 450                              MEGAN T. WILLIAMS, ESQ.
Albany, New York 12207

HON. ERIC T. SCHNEIDERMAN                     ADRIENNE J. KERWIN, ESQ.
Attorney General for the State of New York        Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, New York 12224

GLENN T. SUDDABY, Chief United States District Judge

---

[1] Defendants request that the allegations against Gerstman be dismissed because he is no longer the Commissioner of the DEC and is therefore unable to implement any requested injunctive relief, and because there are no allegations against him that would suggest he is liable for other damages. (Dkt. No. 24, Attach. 4, at 8 n.1 [Defs.' Mem. of Law].) Plaintiff does not respond to this request in his opposition memorandum of law. (Dkt. No. 30 [Pl.'s Opp'n Mem. of Law].) An issue exists as to whether there is a justiciable case or controversy on the equitable relief claims against the current Commissioner pursuant to Fed. R. Civ. P. 25(a)(1). However, the Court need not decide this issue due to the findings in Part III of this Decision and Order, which dismisses all of the claims in Plaintiff's Complaint.

## DECISION and ORDER

Currently before the Court, in this disability discrimination action pursuant to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the New York Human Rights Law ("NYHRL") filed by Daniel Levy ("Plaintiff") against the New York State Department of Environmental Conservation ("DEC"), Marc Gerstman (in his capacity as Acting DEC Commissioner), Tom Martin, Kris Alberga, and Robert Daley (collectively "Defendants"), are the following two motions: (1) Defendants' motion for summary judgment; and (2) Defendants' motion for sanctions against Plaintiff pursuant to Fed. R. Civ. P. 16(f) and 37(c)(1). (Dkt. Nos. 24, 32.) For the reasons set forth below, Defendants' motion for summary judgment is granted, and Defendants' motion for sanctions is denied as moot.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Complaint

Generally, Plaintiff's Complaint asserts six claims. (Dkt. No. 1 [Compl.].) First, Plaintiff claims that the DEC and Gerstman engaged in disability discrimination in violation of the ADA by refusing to provide reasonable accommodations, taking adverse action against him because of his disabilities, refusing to promote him because of discrimination, and providing pretextual reasons for imposing disciplinary actions ("First Claim"). (*Id.* at 18-19.) Second, Plaintiff claims that the DEC and Gerstman retaliated against him in violation of the ADA for seeking accommodations by issuing disciplinary counseling and negative performance reviews and by rejecting him for promotion ("Second Claim"). (*Id.* at 19-20.) Third, Plaintiff claims that the DEC engaged in disability discrimination in violation of Section 504 for the same reasons

2

discussed in relation to his ADA claim ("Third Claim").  (*Id.* at 20-21.)  Fourth, Plaintiff claims

that the DEC retaliated against him in violation of Section 504 for the same reasons discussed in

relation to his ADA claim ("Fourth Claim").  (*Id.* at 21-22.)  Fifth, Plaintiff claims that Martin,

Alberga, and Daley engaged in disability discrimination in violation of the NYHRL for the same

reasons discussed in relation to his ADA claim ("Fifth Claim").  (*Id.* at 22-23.)  Sixth, Plaintiff

claims that Martin, Alberga, and Daley retaliated against him in violation of the NYHRL for the

same reasons discussed in relation to his ADA claim ("Sixth Claim").  (*Id.* at 24-25.)  As relief

for these claims, Plaintiff seeks an injunction requiring that he be provided with the reasonable

accommodations to which he is entitled, compensatory and punitive damages, lost wages and

benefits, attorneys' fees, and any other appropriate relief.

### B.    Undisputed Material Facts on Defendants' Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate

record citations by Defendants in their Statement of Material Facts and expressly admitted by

Plaintiff in his response thereto or denied without appropriate record citations.  (*Compare* Dkt.

No. 24, Attach. 2 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 30, Attach. 2 [Pl.'s Rule 7.1 Resp.].)

As a preliminary matter, the Court notes that, in response to numerous facts, Plaintiff expressly

admits the facts while asserting additional facts; these facts asserted by Defendants are therefore

deemed admitted, notwithstanding the additional facts, which belong in a separately numbered

statement of additional material facts in dispute under N.D.N.Y. L.R. 7.1(a)(3).  (Dkt. No. 30,

Attach. 2, at ¶¶ 27, 43, 45, 53, 60, 74, 88, 90, 105, 106 [Pl.'s Rule 7.1 Resp.].)[2]

---

[2]    *See CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3
(E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by
[Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact,
'Undisputed'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2

1.      In the Summer of 1999, Plaintiff was hired by the DEC as a forest health

inventory technician in a position that was expected to (and did) last until the Fall

of 1999.

2.      After finishing college, Plaintiff took the Forester I civil service examination.

3.      In 2000, Plaintiff was hired by the DEC as a Forester 1 Trainee in its sub-office

located in Lowville, New York, after receiving a canvass letter and interviewing.

4.      The Forester 1 Trainee position in Lowville was available because of federal

funding that was given to the DEC to address damage from a major ice storm in

1998.

5.      When the federal funding for ice storm positions ended, staff hired under that

funding were offered other positions within the DEC.

6.      Among several choices, Plaintiff chose to take the Forester 1 position available in

Ray Brook in the Division of Lands and Forests.

---

(S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").  The Court notes that, to the extent that Plaintiff is attempting to controvert the implication of the asserted fact and/or place it in context, a Rule 7.1 Response is not the means by which to dispute a possibly implied fact but the means by which to dispute an expressly asserted fact.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's assertions in matching numbered paragraphs.") (emphasis added); *see, e.g., Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts").

7.      In February 2016, Plaintiff admitted that his choice to take the Forester 1 position in Ray Brook "might have been not" the best choice for him because it requires him to use his "weakest abilities" instead of his strengths.[3]

8.      When Plaintiff took the Forester 1 position in Ray Brook, his direct supervisor was Peter Grupe (a Forester 2), and Mr. Grupe's supervisor was Tom Martin.

9.      Shortly after starting as a Forester 1 in Ray Brook, Plaintiff was assigned to develop unit management plans ("UMP") for two planning units: Lake Champlain Islands and Taylor Pond.

10.     Developing a unit management plan is a step-by-step process guided by the Adirondack Park state land master plan.

11.     Pursuant to the master plan, UMP development by a Forester involves, among other things, the following steps: (1) inventoring the land unit in the field; (2) getting public comment on the planning of the land unit; (3) reviewing the public comment with other members of the interdisciplinary planning team; and (4) developing a written document that analyzes the data collected and outlines the current use of the land and proposed changes based on the analysis.

12.     The amount of time that it takes to complete a UMP from start to finish varies depending on the complexity of the lands and management needed.

13.     Plaintiff's work schedule is 7:00 am to 3:00 pm.

---

[3]      Plaintiff denies this fact, arguing that it was taken out of context.  (Dkt. No. 30, Attach. 2, at ¶ 7 [Pl.'s Rule 7.1 Response].)  However, the overall context of this statement does not contradict the stated fact, and it is therefore deemed admitted.

14.    After Plaintiff's workday ends, he engages in exercise including hiking, biking, snowshoeing, cross-country skiing, yard work, housecleaning, firewood cutting, volleyball, and running on an elliptical machine at the gym.

15.    Plaintiff generally gets more than four hours of exercise every day after his work.

16.    It is rare that Plaintiff cannot get any exercise at all after work.[4]

17.    To manage his diabetes, Plaintiff eats when his blood sugar is low.[5]

18.    To manage his diabetes, Plaintiff exercises if his blood glucose level is rising above 170mg/dl, but, if it is above 250mg/dl, he does not do intense exercise.

19.    When his blood glucose levels are too high to exercise, Plaintiff can use only insulin to manage his diabetes.

20.    Plaintiff is always able to test his blood sugar at work when needed.

21.    When Plaintiff was first assigned to work on the Taylor Pond and Lake Champlain Island land units, little to no planning had previously been done on those units.

---

[4]    Plaintiff denies this fact; however, while Plaintiff did state in his deposition that it is common for him to be unable to do *intense* exercise immediately after work if he has been sedentary during the day, he also stated that, in those cases, he would try to "do low levels of exercise" to bring down his blood glucose level, and stated that "it's rare that I can never get activity at all."  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 30, Attach. 2, at ¶ 17 [Pl.'s Rule 7.1 Resp.]; *see also* Dkt. No. 24, Attach. 1, at 77:6-78:20 [Pl.'s Deposition].)  Because Plaintiff has not cited evidence contradicting the fact at issue, this fact is deemed admitted.  *See Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's . . . statement but declined to provide record citations in support).

[5]    Plaintiff denies this fact, but the evidence cited merely supports additional facts rather than disputing the fact asserted by Defendants.  This fact is therefore deemed admitted.  (*Compare* Dkt. No. 24, Attach. 2, at ¶ 18 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 30, Attach. 2, at ¶ 18 [Pl.'s Rule 7.1 Resp.].)  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319.

22.     Plaintiff was responsible for managing the Taylor Pond land unit from

approximately 2003 until 2013.

23.     After Plaintiff's involvement with writing the Taylor Pond UMP ended, he

continued to manage that land until "after [the UMP ]was approved, after [he]

began some implementation projects."[6]

24.     Kris Alberga became Plaintiff's direct supervisor in approximately 2003.

25.     At some time between 2004 and 2007, Plaintiff made a request to the DEC for a

reasonable accommodation to address his diabetic condition.

26.     Plaintiff sought this accommodation because he experienced resistence when he

tried to modify his work schedule as he deemed necessary.[7]

27.     Plaintiff's inability to modify his work schedule was due to his supervisor, Kris

Alberga, directing him to work only on completing the writing of a UMP.[8]

28.     Goal dates for completing team drafts of UMPs change continuously based on the

time it takes to accomplish the tasks necessary in the development phase.

---

[6]     Plaintiff denies this fact, arguing that it is unclear what Defendants meant.  (Dkt.
No. 30, Attach. 2, at ¶ 25 [Pl.'s Rule 7.1 Resp.].)  However, Defendants' statement is supported
by the cited evidence, and Plaintiff has offered no evidence to dispute it.  (Dkt. No. 24, Attach. 2,
at ¶ 25 [Defs.' Rule 7.1 Statement.])  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319.  The
Court has re-worded this fact in accordance with the evidence for purposes of clarity.

[7]     Plaintiff denied this fact because of lack of clarity as to "this accommodation"';
however, he acknowledges that he testified to having trouble modifying his schedule as needed
to adjust his physical activity.  (Dkt. No. 30, Attach. 2, at ¶ 28 [Pl.'s Rule 7.1 Resp.].)  This fact
is therefore deemed admitted.

[8]     Plaintiff denies this fact, but only to the extent that Defendants suggest that
Plaintiff had been able to unilaterally modify his work schedule.  The Court therefore has
omitted the word "unilaterally" and deemed the remainder of this fact admitted.  (*Compare* Dkt.
No. 24, Attach. 2, at ¶ 29 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 30, Attach. 2, at ¶ 29 [Pl.'s
Rule 7.1 Resp.].)

29.    Plaintiff was always aware of the set goal dates.

30.    After a Forester 1 completes a team draft of a UMP, it must be reviewed by his direct supervisor, the Regional Forester, the Natural Resources Supervisor, the Regional Director, the Adirondack Park Agency, and the DEC Commissioner's Office.

31.    A UMP can be sent back to the authoring Forester at any time along the review process for edits.

32.    After Plaintiff's direct supervisor reviews Plaintiff's team draft on a UMP, that supervisor either (1) makes comments on it and sends it to the Regional Forester for comment and then the document comes back to Plaintiff to incorporate the comments, or (2) sends it back to Plaintiff to make changes before it gets sent to the Regional Forester for review.

33.    The Taylor Pond UMP and Lake Champlain Islands UMP were sent back to Plaintiff many times for changes to be made.

34.    Any time that Kris Alberga told Plaintiff to work at his desk (rather than outside) was in order for Plaintiff to complete something in a UMP document.[9]

---

[9]    Plaintiff denies this fact to the extent of Alberga's motivation but fails to cite any evidence to support that denial.  (Dkt. No. 30, Attach. 2, at ¶ 36 [Pl.'s Rule 7.1 Resp.].)  This fact is therefore deemed admitted.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *see also N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations").

35.    On July 31, 2013, Robert Daley met with Plaintiff regarding Plaintiff's assertion that he needs to be able to adjust his schedule and work outside.[10]

36.    During the July 13, 2013, meeting, Plaintiff said, "[I]f there was a gym in the office, I could use the gym" to get his necessary physical activity.[11]

37.    To get guidance and understanding about the requirements of Plaintiff's 2007 accommodations, Robert Daley suggested that he and Plaintiff schedule a meeting with Juan Abadia.

38.    Plaintiff met with Juan Abadia in August 2013 and complained that the following three accommodations were not being made by Robert Daley: (a) providing Plaintiff assignments in writing; (b) permitting Plaintiff to adjust his schedule on a daily basis (i.e., come in late or leave early and make up time instead of using sick leave); and (c) allowing Plaintiff to work on a variety of assignments to get physical activity.[12]

---

[10]    Plaintiff notes that Robert Daley and Plaintiff spent a portion of this meeting setting up an additional meeting with Juan Abadia to discuss these issues; however, that fact does not contradict the asserted fact that this initial meeting was regarding Plaintiff's requests for accommodations related to his activity level, even if they did not resolve or discuss in great detail those issues at that meeting.  (Dkt. No. 30, Attach. 2, at ¶ 38 [Pl.'s Rule 7.1 Response].)

[11]    Plaintiff denies this fact as an out-of-context statement; however, Plaintiff's additional assertion that he would rather do field work for exercise in order to be more productive does not negate the fact that he admitted he would be able to use a gym for exercise if there was one in the office.  (Dkt. No. 30, Attach. 2, at ¶ 39 [Pl.'s Rule 7.1 Response].)

[12]    Plaintiff denies this statement by noting that his deposition indicates that he and Abadia "went through the entire list of accommodations and talked about the issues that were going on."  (Dkt. No. 30, Attach. 2, at ¶ 41 [Pl.'s Rule 7.1 Response].)  However, although the depositions states as much, it also indicates that the three accommodations listed in Defendants' Statement of Material Facts "were the issues" he was specifically having with his supervisor. (Dkt. No. 41, Attach. 1, at 155:7-20 [Pl.'s Dep.].)  Plaintiff's denial therefore does not dispute that these three specific accommodations were at issue in this meeting.  *See Willis v. County of*

39.    DEC offered to provide a treadmill for Plaintiff to use in the workplace when he needed physical activity.

40.    Plaintiff rejected the offer of making a treadmill available for his use.

41.    DEC offered to transfer Plaintiff to a Forester 1 position in the Saratoga Tree Nursery.

42.    Plaintiff rejected the offered transfer to the Forester 1 position in the Saratoga Tree Nursery.

43.    After Robert Daley took over as Plaintiff's direct supervisor, Plaintiff had little contact with Kris Alberga.

44.    Plaintiff interviewed for at least three Forester 2 positions while Kris Alberga was his direct supervisor, and was not offered any of them.

45.    Plaintiff interviewed for at least three Forester 2 positions while Robert Daley was his direct supervisor, and was not offered any of them.

46.    After Robert Daley became Plaintiff's direct supervisor, Plaintiff's attorney requested that Plaintiff be provided with direct access to an editorial assistant as an accommodation for Plaintiff's written work.

---

*Onondaga*, 14-CV-1306, 2016 WL 7116126, at *5, n.10 (N.D.N.Y. Dec. 6, 2016) ("This partial denial is ineffective . . . [because] it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3)."); *cf. Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with N.D.N.Y. Local Rule 7.1[a][3]).

47.    The request for an editorial assistant was made because Kris Alberga and Tom Martin were no longer serving as Plaintiff's editorial assistant.[13]

48.    During Plaintiff's November 5, 2013, interview for a Forester 2 position, Kris Alberga advised Plaintiff that the position required that the employee be in the office most of the time.

49.    During the November 5, 2013, interview for a Forester 2 position, Tom Martin asked Plaintiff if he thought he would be able to do an office-based job, and Plaintiff said that he thought the job would provide him with enough opportunity to get his requisite physical activity.

50.    Plaintiff recorded the November 5, 2013, interview without the knowledge of Tom Martin or Kris Alberga.

51.    During the February 25, 2016, interview for a Forester 2 position, Kris Alberga informed Plaintiff that the position would be primarily an in-office position.

52.    With Plaintiff's knowledge and consent, Tom Martin and Kris Alberga recorded the February 25, 2016, interview.

53.    In 2013, when an editorial assistant was briefly available for use by Forester 1s in the Ray Brook office, more than 1,900 necessary grammatical changes were identified by that assistant, Kris Alberga, and Tom Martin in one of Plaintiff's UMP drafts.

---

[13]    Plaintiff denies this fact, but fails to cite any evidence in support of the denial. (Dkt. No. 30, Attach. 2, at ¶ 51 [Pl.'s Rule 7.1 Resp.].)  This fact is therefore deemed admitted. *See Rizzo v. Health Research, Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted.")*; Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49.

54.     Plaintiff alleges that he has the following disabling conditions: (a) hearing loss;

(b) diabetes; and (c) a learning disability.

55.     In 2007, the DEC granted Plaintiff the following reasonable accommodations to

address these conditions: (a) work breaks with walking within the DEC's time

and attendance rules; (b) eating when needed; (c) blood testing when needed; (d)

insulin injections when needed; (e) a food storage area; (f) using the bathroom as

needed; (g) varied work assignments depending on blood glucose levels through

consultation with Plaintiff; (h) flexible scheduling through work schedule

adjustments; (i) minimized stress in interaction; (j) outdoor assignments as

permitted by weather and the existing DEC mission; (k) clear and precise

instruction whenever possible, with clarifying feedback; (l) written confirmation

of verbal assignments; (m) permission to take notes during assignments; (n) a

telephone with volume control and clear reception; and (o) a work environment

that allows Plaintiff to preserve his dignity while accomplishing the DEC's

mission.

56.     Plaintiff's specific complaint in August 2013 was that supervisors required him to

complete office-based work instead of permitting him to determine when he

needed to work outside.[14]

---

[14]     Plaintiff denies this fact, citing a September 2012 letter he allegedly attached to
an August 1, 2013, email to Juan Abadia.  (Dkt. No. 30, Attach. 2, at ¶ 67 [Pl.'s Rule 7.1
Response].)  However, although this letter does support Plaintiff's assertion of additional
complaints, the cited exhibit does not establish that Plaintiff in fact attached this letter to the
August 1, 2013, email; Plaintiff therefore has not cited admissible record evidence to create a
genuine dispute as to Defendants' asserted fact.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at
319; *N.Y. Teamsters*, 426 F.3d at 648-49.

57.    Plaintiff also complained about the imposition of short deadlines, which caused him to have to cancel previously scheduled meetings or field work.

58.    Juan Abadia scheduled a meeting with Plaintiff and Plaintiff's supervisors, Robert Daley and Kris Alberga, to discuss the issues.

59.    That meeting took place on August 16, 2013.

60.    During that meeting, Mr. Abadia offered to obtain a treadmill for Plaintiff to use in his workplace if he felt that physical activity was necessary when he was assigned work that needed to be completed in the office.

61.    Plaintiff refused that accommodation.

62.    In September 2013, Plaintiff requested a further accommodation to address his diabetic condition in the form of "long periods of large muscle exercise."[15]

63.    In a September 4, 2013, letter written on Plaintiff's behalf, the following accommodation request was made to the DEC for the first time: "direct access to the administrative support staff person in the Warrensberg office who now provides editorial assistance to the Ray Brook office."

64.    As a result, in September 2013, the DEC's Office of Administrative Action requested medical documentation to support both of the requests for long periods of large muscle activity and editorial assistance.

65.    On September 24, 2013, Plaintiff provided Juan Abadia with a report from endocrinologist Dr. Mary Luidens.

---

[15]    Although Plaintiff denied the portion of Defendants' statement related to Plaintiff's learning disability, he did not deny the portion related to his diabetes. (Dkt. No. 30, Attach. 2, at ¶ 75 [Pl.'s Rule 7.1 Response].) This portion is therefore deemed admitted. *Willis*, 2016 WL 7116126, at *5, n.10; *Aktas*, 877 F. Supp. 2d at 5 n.3.

66.    On January 8, 2014, Plaintiff provided Juan Abadia with a report from Dr. Alan Barnett dated December 12, 2013.

67.    The only writing-related accommodation recommended by Dr. Barnett in that report was for "use of [a] word processing program with spell-check and grammar check."[16]

68.    It was learned that a Forester 1 position would soon become available at the Saratoga Tree Nursery, which is a working tree farm.

69.    Juan Abadia obtained the necessary internal concurrence from management to offer and reassign Plaintiff to that position.

70.    That transfer was offered to Plaintiff on March 10, 2014, and rejected by him on March 11, 2014.[17]

71.    In an attempt to accommodate Plaintiff's alleged needs to take leave to manage his diabetic condition, Juan Abadia inquired of the DEC whether Plaintiff would be eligible for benefits under the Family Medical Leave Act ("FMLA").

72.    Such benefits would include Plaintiff being able to choose between using accrued leave time with pay or taking FMLA leave without pay.

_____

[16]    Plaintiff denies this fact "in so far as no such report is attached," but Juan Abadia's declaration substantiates the accommodations stated in that report, and Plaintiff fails to cite any evidence to support the denial.  (Dkt. No. 25, Attach. 1, at ¶¶ 37-38 [Abadia Decl.] Dkt. No. 30, Attach. 2, at ¶ 81 [Pl.'s Rule 7.1 Resp.].)  This fact is deemed admitted.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49.

[17]    Plaintiff denies this fact because "[t]he exhibit cited by Defendants . . . is not a letter dated March 10, 2014."  (Dkt. No. 30, Attach. 2, at ¶ 85 [Pl.'s Rule 7.1 Response].)  However, the Abadia declaration cited by Defendants does support Defendants' fact, and Plaintiff cites no evidence to contradict that declaration.  This fact is therefore deemed admitted.  *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319; *N.Y. Teamsters*, 426 F.3d at 648-49.

73.  On April 1, 2014, Juan Abadia and the DEC FMLA representative Lauri

Beliguard had a lengthy telephone conversation with Plaintiff about FMLA.

74.  The DEC supplied Plaintiff with the FMLA certification form to be completed by

a physician; but, despite sending several reminders, Plaintiff never submitted the

certification.

75.  Plaintiff filed a Charge of Discrimination with the Equal Employment

Opportunity Commission ("EEOC") dated March 20, 2014, which was received

by the EEOC on March 31, 2014; the DEC learned of this charge on April 21,

2014.

76.  On May 2, 2014, Juan Abadia, DEC attorney Phil Lodico, and Robert Daley met

with Plaintiff and his advocate to discuss Plaintiff's claims regarding the 2007

accommodations of varied work assignments and opportunity for outdoor activity.

77.  By letter dated December 9, 2014, Juan Abadia informed Plaintiff that the reports

provided by Dr. Luidens and Dr. Barnett were "clinical descriptions of your

conditions, but do not link these conditions to accommodations you need to fulfill

your DEC duties as a Forester 1."

78.  By letter dated December 19, 2014, Plaintiff's attorney disagreed with Juan

Abadia's December 9, 2014, letter.

79.  Additionally, by letter dated January 13, 2015, the DEC informed Plaintiff that

the reports provided by Dr. Barnett and Dr. Luidens did not support Plaintiff's

new requests for reasonable accommodations in the form of (a) a minimum of two

days of outdoor work each week, and (b) use of an editorial assistant.[18]

80.     Specifically, the DEC's January 13, 2015, letter stated that "Dr. Luidens does not

        call for DEC to incorporate physical exercise into [Plaintiff's] work duties, nor

        does she specify what physical exercise [Pliantiff] can do during the work day to

        control his disabling condition."

81.     That letter also states as follows:

        With respect to your request for an[] "editorial assistant," Dr. Barnett
        only recommend[ed] that [Plaintiff] have "a word processing program
        with spell-check and grammar check."  I note that the word
        processing program installed on [Plaintiff's] work computer has those
        features (Your December 19 letter appears to acknowledge that the
        request for an "editorial assistant" goes beyond Dr. Barnett's
        recommendation.)  In addition, it is unclear what specific "editorial"
        services [Plaintiff] requires to perform his duties.

82.     Finally, the DEC's January 13, 2015, letter states as follows:

        More information is needed to evaluate whether the requested
        additional accommodations are necessary to address [Plaintiff's]
        disabling conditions.  If additional accommodations are found to be
        necessary, we will then determine through the interactive process
        what accommodations are reasonable to effectively address those
        conditions and fulfill the Department's mission.

83.     On March 25, 2015, Plaintiff provided the DEC with a March 17, 2015, letter from

        Dr. Luidens, which stated, inter alia,

        I am requesting that [two-to-four] hours of large muscle activity
        [two-to-four] days per week be incorporated into [Plaintiff's] regular
        work schedule.  This would include such activities as hiking in the

---

[18]     Plaintiff denies this fact because "[t]he exhibit cited by Defendants . . . is not a
letter dated January 13, 2015."  (Dkt. No. 30, Attach. 2, at ¶ 95 [Pl.'s Rule 7.1 Response].)
While Plaintiff is correct that Defendants misidentified the location of the letter as Exhibit S of
the Lodico declaration rather than Exhibit R, this letter is clearly in the materials submitted with
Defendants' motion and it supports Defendants' stated fact.  (Dkt. No. 25, Attach. 2, at 143-44.)

woods, snow-shoeing, cross-country skiing, mountain biking, and other similar activities, all of which I understand are included in the duties of his job. This would be in addition to the exercise he is already doing outside of regular work hours. Large muscle activity is essential for him to help stabilize his fluctuating blood glucose levels caused by his Type 1 diabetes, and also helps to address the increased stress levels that he has due to the writing activities that are required of him at work.

84. Plaintiff, Tom Martin, Kris Alberga, and Robert Daley all completed required Equal Employment Opportunity Rights and Responsibility training from 2013 through 2016.

85. Plaintiff, Tom Martin, Kris Alberga, and Robert Dailey all completed required Reasonable Accommodation training from 2014 through 2016.

86. Plaintiff's 2012-2013 unsatisfactory performance evaluation was overturned based on technical deficiencies as a result of a union grievance.[19]

87. No one other than Plaintiff's chain of command and Human Resources staff has access to the contents of Plaintiff's personal history file, including the 2012-2013 unsatisfactory evaluation.

88. Plaintiff's 2012-2013 performance evaluation is not available to interviewers who are considering Plaintiff for a Forester 2 position outside of Region 5.

---

[19] Plaintiff asserts that the failure to follow the procedure outlined in the collective bargaining agreement was more than a "technical deficiency." However, the evidence he cites as support specifically states that his unsatisfactory rating "has been overturned based on technical deficiencies." (Dkt. No. 30, Attach. 2, at ¶ 100 [Pl.'s Rule 7.1 Response].) Plaintiff therefore has not adduced evidence to dispute Defendants' asserted fact, and this fact is therefore deemed admitted.

### C.     Parties' Briefing on the Pending Motions

#### 1.     Defendants' Motion for Summary Judgment

##### a.     Defendants' Memorandum of Law

In their motion for summary judgment, Defendants assert four arguments.  (Dkt. No. 24, Attach. 4, at 8-45 [Defs.' Mem. of Law].)  First, Defendants argue that any claims based on conduct occurring before June 4, 2013, are untimely.  (*Id.* at 13-17.)  More specifically, Defendants argue that, because Plaintiff was required to file his EEOC charge within 300 days of the alleged discrimination, any incidents occurring before June 4, 2013, would be time-barred. (*Id.* at 14-16.)  Defendants further argue that incidents occurring before June 4, 2013, cannot be considered as part of a continuing violation because Plaintiff testified that the failure to accommodate his disabilities worsened after Daley became his supervisor in May 2012.  (*Id.* at 16-17.)

Second, Defendants argue that Plaintiff is unable to establish a claim of disability discrimination because the ADA, Section 504, and NYHRL require only the provision of accommodations that allow an individual to perform his or her job, not accommodations that would improve the individual's health or require revision of the job descriptions of other employees.  (*Id.* at 17.)  Specifically, Defendants argue as follows: (a) Plaintiff has failed to show he was disabled within the meaning of the ADA because he has not shown that his diabetes impacts his ability to work rather than merely that his job interferes with his ability to manage his diabetes; (b) the accommodations offered and/or provided were reasonable, including the offer to put a treadmill in the office, to allow Plaintiff to transfer to a different position of an equivalent rank, and the provision of spelling and grammar tools; (c) further accommodations

18

requested by Plaintiff were both an undue burden and unsupported by medical or other evidence; (d) Plaintiff is not qualified to perform all the essential functions of his job; and (e) Plaintiff has failed to show that he suffered an adverse action because of his disability. (*Id.* at 18-36.)

Third, Defendants argue that Plaintiff is unable to establish a claim of retaliation against the DEC and the DEC Commissioner. (*Id.* at 36-43.) More specifically, Defendants argue that it is not clear what retaliatory adverse actions Plaintiff is alleging, other than a denial of requests for accommodations after he complained about the denial of his requests for accommodations. (*Id.*) Defendant also argues that some of the actions Plaintiff alleges to be retaliatory occurred before he made complaints about his accommodations. (*Id.*)

Fourth, Defendants argue that Plaintiff is unable to establish violations of the NYHRL because none of the Defendants directly and purposefully participated in acts of discrimination or retaliation against Plaintiff. (*Id.* at 43-45.) Specifically, Defendants argue that (a) none of them were involved in decisions regarding accommodations, (b) Daley was not involved in any interviews or decisions related to Plaintiff's attempts to be promoted to Forester 2, (c) Martin and Alberga did not write counseling memorada or negative evaluations during the relevant time period, and (d) none of them set the work priorities for the DEC. (*Id.*)

### b.      Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff makes five arguments. (Dkt. No. 36, Attach. 2, at 16-32 [Pl.'s Opp'n Mem. of Law].) First, in opposition to Defendants' second argument, Plaintiff argues that he qualifies as a person with a disability under the ADA, Section 504, and NYHRL because (a) his diabetes substantially impairs the function of his endocrine system and affects his ability to perform job tasks, (b) his hearing impairment impairs

his abilities to hear and communicate, and (c) his learning disability impairs his ability to communicate.  (*Id.* at 16-17.)

Second, also in opposition to Defendants' second argument, Plaintiff argues that he is qualified to perform the essential functions of his job, noting that he has been working as a forester since 2000 and has always been in good standing with no unsatisfactory evaluations until this litigation.  (*Id.* at 17-18.)

Third, in opposition to Defendants' third and fourth arguments, Plaintiff argues that the denial of fieldwork assignments was a refusal of a reasonable accommodation in retaliation for Plaintiff's efforts to obtain accommodations.  (*Id.* at 18-28.)  Specifically, Plaintiff argues that fieldwork is medically necessary to successfully manage his blood glucose level, citing to a declaration from his endocrinologist Dr. Leinung, that supports his assertion of medical necessity.  (*Id.* at 24-28.)  Plaintiff also argues that he was required to do more UMP work than other colleagues, that other foresters often performed fieldwork throughout the winter contrary to assertions that there was less fieldwork during that time of year, and that the accusations that he failed to perform his job duties and follow instructions are false and in retaliation for his pursuit of accommodations.  (*Id.* at 19-24.)

Fourth, in opposition to Defendants' second argument, Plaintiff argues that use of an editorial assistant was a reasonable accommodation.  (*Id.* at 28-29.)  Specifically, Plaintiff argues that the request was based on his learning disability, and that the request was reasonable and would not cause undue hardship because he would be able to use existing administrative staff for this function.  (*Id.*)

Fifth, in opposition to Defendants' fifth argument, Plaintiff argues that Defendants retaliated against him in violation of the NYHRL by sabotaging his opportunities for promotion to a Forester 2 position, noting in particular that, regarding the eight positions he has interviewed for, he had a higher civil service examination score than four of the successful candidates and more forestry experience than all but one of the successful candidates. (*Id.* at 31-32.)

### c.    Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiff's opposition memorandum of law, Defendants make three arguments. (Dkt. No. 31, at 5-11 [Defs.' Reply Mem. of Law].) First, Defendants argue that, in his opposition memorandum, Plaintiff admitted he did not require accommodations for writing beyond those provided to other Forester 1s. (*Id.* at 5.) Defendants also argue that there are discrepancies in Plaintiff's testimony and allegations about whether his previous supervisors had acted as editorial assistants on his UMP drafts. (*Id.*)

Second, Defendants argue that Plaintiff's discussion of the facts misrepresents the evidence, arguing in particular that there is evidence of Plaintiff's poor writing skills throughout the record that contradict his assertion that he is qualified to perform the essential functions of his job. (*Id.* at 6-7.) Defendants also argue that the fact that Plaintiff has had more UMPs is not by itself evidence of discrimination, and that there is no evidence that his hearing impairment has not been reasonably accommodated. (*Id.* at 7-8.) Defendants also note that Plaintiff's arguments rely on facts post-dating the Complaint. (*Id.* at 8.)

Third, Defendants argue that the statements in Plaintiff's post-deposition declaration that contradict or elaborate on his deposition testimony should be disregarded because they were submitted for the sole purpose of opposing Defendants' motion for summary judgment. (*Id.* at 9-12.)

### 3.    Defendants' Motion for Sanctions

#### a.    Defendants' Memorandum of Law

In their motion for sanctions, Defendants argue that they are entitled to sanctions pursuant to Fed. R. Civ. P. 16(f) and 37(c)(1) and N.D.N.Y. L.R. 26.3 based on Plaintiff's failure to obey the scheduling order regarding expert witness disclosures. (Dkt. No. 32, Attach. 2, at 4-11 [Defs' Mem. of Law].) Specifically, Defendants argue that Plaintiff violated the above-mentioned rules by using a declaration from treating physician Dr. Leinung in his opposition memorandum because Plaintiff did not disclose Dr. Leinung during the discovery period. (*Id.* at 7-11.) Defendants therefore request that Dr. Leinung's testimony be excluded when considering the motion for summary judgment and struck from the record. (*Id.* at 11.)

#### b.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff asserts five arguments. (Dkt. No. 38, at 3-11 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that the authority cited by Defendants related to expert witnesses is not applicable to a treating physician. (*Id.* at 3-4.) Plaintiff argues that Defendants were aware that Dr. Leinung was a treating physician rather than an expert witness based on previous discovery documents. (*Id.* at 4-5.)

Second, Plaintiff argues that using Dr. Leinung's declaration did not violate N.D.N.Y. L.R. 26.3 because Dr. Leinung was identified in an interrogatory in April 2016, well before the November 2016 expert disclosures deadline; Plaintiff argues that there was no requirement to submit a supplemental disclosure. (*Id.* at 5-6.)

Third, Plaintiff argues that exclusion is an extreme remedy and should not be applied here. (*Id.* at 7-9.)

Fourth, Plaintiff argues that there is no basis for sanctions because he was not obligated to disclose Dr. Leinung as an expert witness and Defendants were not harmed by the failure to disclose because they had the opportunity to respond to that declaration in their reply memorandum. (*Id.* at 9-10.) Plaintiff additionally argues that Defendants were not denied the opportunity to depose Dr. Leinung because it was evident from the medical records and evidence from April 2016 that Dr. Leinung was a treating physician. (*Id.* at 10.)

Fifth, Plaintiff argues that an opportunity to depose Dr. Leinung would have no bearing on the motion for summary judgment, and so the Court should first decide Defendants' motion for summary judgment before granting Defendants the ability to do so. (*Id.* at 10-11.)

c.    **Defendants' Reply Memorandum of Law**

Generally, in reply to Plaintiff's opposition memorandum of law, Defendants assert two arguments. (Dkt. No. 39, at 4-12 [Defs.' Reply Mem. of Law].) First, Defendants argue that, as a treating physician, Dr. Leinung is an expert witness who is not required to provide a report as defined by Fed. R. Civ. P. 26; Defendants note also that, under the rules, a treating physician who is not serving as an expert witness is permitted to testify only about matters within their personal knowledge. (*Id.* at 5-7.) Defendants argue that, because Plaintiff did not properly disclose Dr. Leinung pursuant to Fed. R. Civ. P. 26, Dr. Leinung would be permitted to testify only about the treatment he personally provided; however, the declaration he provided goes well beyond that personal knowledge and therefore should be struck. (*Id.* at 7-10.)

Second, Defendants argue that the prejudice from Plaintiff's failure to disclose cannot be remedied because it prevented them from timely objecting to use of Dr. Leinung as a witness and from obtaining deposition testimony clarifying portions of his opinion. (*Id.* at 10-11.) Defendants argue that, contrary to Plaintiff's assertion, mentioning Dr. Leinung on a list of 14 other medical providers did not provide sufficient notice to Defendants that they would need to depose Dr. Leinung or that Dr. Leinung would be called to testify, particularly because Dr. Leinung treated Plaintiff only once (after the current litigation had already been filed). (*Id.* at 11-12.)

## II.    LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[20] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the

---

[20]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).[21]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[22]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

---

[21]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[22]    *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

statement.[23]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[24]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[23]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[24]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

III.    ANALYSIS

   A.    Whether Dr. Leinung's Declaration Should Be Stricken and Plaintiff Be Subject to Sanctions Based on Violations of Federal and Local Rules of Civil Procedure

   After careful consideration, the Court finds that motion for sanctions (namely, to strike Dr. Leinung's declaration) should be denied as moot.

   The Court notes that it would render the same decision on the issues raised in Defendants' motion for summary judgment even if it denied in its entirety Defendants' motion for sanctions for two reasons.  First, regardless of whether Dr. Leinung's declaration (and, specifically, his opinion regarding Plaintiff's need for large muscle activity during the workday) were to be stricken from the record, another physician, Plaintiff's treating endocrinologist, Dr. Ludens, also opined on the same limitation for two to four hours of large muscle activity two to four days per week as part of Plaintiff's work schedule.  (Dkt. No. 25, at ¶ 12 [Graziadei Decl.]; Dkt No. 25, Attach. 1, at 52; Dkt. No. 30, Attach. 1, at 489 ¶ 13 [Leinung Decl.].)  Because Plaintiff relies on these opined limitations to support his argument that (a) large muscle activity was a reasonable accommodation and (b) medically necessary to manage his blood glucose levels, Plaintiff's arguments do not depend entirely on Dr. Leinung's declaration.  Second, even if there are portions of Dr. Leinung's declaration that are not the same as or similar to Dr. Ludens' opinion or other evidence in the record, Dr. Leinung's declaration and opinion as a whole would not alter the Court's findings outlined in Part III.B of this Decision and Order because those findings are based on considerations other than the medical evidence related to Plaintiff's diabetes.  The Court therefore denies Defendants' motion for sanctions as moot.

**B.     Whether Plaintiff's Claims Arising Before June 4, 2013, Are Barred by the Applicable Statute of Limitations**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law.  (Dkt. No. 24, Attach. 4, at 13-17 [Defs.' Mem. of Law].)  To those reasons, the Court adds the following analysis.

As an initial matter, the Court notes that Plaintiff, in his opposition memorandum of law, failed to oppose or respond to Defendants' argument regarding the statute of limitations.  As a result, Defendants' burden with respect to this argument is "lightened such that, in order to succeed, the argument need only have facial merit."  *See Am. Honda Fin. Corp. v. V.M. Paolozzi Imports, Inc.*, 10-CV-1055, 2012 WL 12883638, at *8 (N.D.N.Y. Mar. 29, 2012) (Suddaby, J.) (stating that the moving party's burdened is lightened when the party opposing a motion for summary judgment fails to respond to an argument contained in the motion).

"Normally, 'a plaintiff may not assert claims based on events that took place more than 300 . . . days before the submission of an administrative charge of discrimination to the EEOC.'" *Zavala v. Cornell Univ.*, 9 F. Supp. 3d 213, 221 (N.D.N.Y. 2014) (Kahn, J.).  However, it may be possible for a plaintiff to assert claims based on events occurring more than 300 days before the filing of the EEOC charge where alleged conduct within the appropriate period is part of a continuing violation.  "'[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Schapiro v. New York City Dept. of Health*, 25 F. App'x 57, 60 (2d Cir. 2001) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 [2d Cir. 1994]).  "'[W]here a continuing violation can be shown, the plaintiff is entitled to bring suit challenging

all conduct that was a part of that violation, even conduct that occurred outside the limitations period.'" *Schapiro*, 25 F. App'x at 60. "As a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor." *De La Peña v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 407 (E.D.N.Y. 2013) (internal quotation marks omitted), *aff'd*, 552 F. App'x 98 (2d Cir. 2014). Thus, only "compelling circumstances will warrant the application of the exception to the statute of limitations." *De La Peña*, 953 F. Supp. 2d at 407.

Defendants argue that all alleged incidents related to Plaintiff's claims of discrimination and retaliation that occurred before June 4, 2013, are untimely based on the March 31, 2014, receipt date of Plaintiff's EEOC charge (dated March 20, 2014), and that the continuing violation is inapplicable to that conduct because many of those incidents occurred when Alberga was Plaintiff's supervisor, while "Plaintiff testified that the alleged failure to accommodate his disabilities got a lot worse after Rob Daley became his supervisor." (Dkt. No. 24, Attach. 2, at 15-16 [Defs.' Mem. of Law].)

In his Complaint, Plaintiff alleges a number of discriminatory or retaliatory actions including the following: (a) Alberga's refusal to comply with accommodations related to physical activity and written instructions from 2010 to 2012, (b) Daley's failure to comply with accommodations related to physical activity and variable work schedule beginning in 2012, (c) a July 2013 counseling memo issued by Daley and subsequent restrictions from using a chainsaw and other motorized equipment without permission as well as a February 2014 counseling memo related to insubordination, (d) an unsatisfactory performance evaluation in October 2013, (e) failure to promote him to Forester 2 on multiple occasions from 2013 through 2015, and (f) failure to respond to a request for access to an administrative assistant for editing of UMPs in

May 2014, which was later denied in August 2014.  (Dkt. No. 1, at ¶¶ 28, 30, 32, 34-35, 38, 40,

43-44, 46-50, 53-55, 57-61, 74-78, 81-83, 86, 88-89, 91, 94, 97, 104-06, 110 [Compl.].)

  Even if each of these alleged violations were supported by admissible record evidence,

the alleged violations of Plaintiff's rights would not qualify as a continuing violation.  Notably,

even though Plaintiff's supervisors allegedly refused to honor the accommodations he had been

granted on multiple occasions since 2010, all of the actions taken were discrete incidents that

could have been actionable on their own rather than an employment practice that "'cannot be

said to occur on any particular day.'"  *See Troeger v. Ellenville Cent. Sch. Dist.*, 523 F. App'x

848, 851 (2d Cir. 2013) (finding that alleged failure to accommodate by forcing employee to use

sick days was barred because each instance of such practice constituted a "a 'single act' [that]

would, if unlawful, 'be actionable on its own'").  Notably, the Second Circuit has held that "[t]he

rejection of a proposed accommodation is a single completed action when taken," noting that,

"[a]lthough the *effect* of the employer's rejection continues to be felt by the employee for as long

as he remains employed, that continued effect is similar to the continued effect of being denied a

promotion or denied a transfer . . . [which are] examples of a discrete act."  *Elmenayer v. ABF

Freight Sys., Inc.*, 318 F.3d 130, 135 (2d Cir. 2003); *see also Lambert v. Genesee Hosp.*, 10 F.3d

46, 53 (2d Cir. 1993) (holding that "multiple incidents of discrimination, even similar ones, that

are not the result of a discriminatory policy or mechanism do not amount to a continuing

violation"); *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1404 (2d Cir.

1993) (stating that "continuous violation exception applies only where discrimination is

accomplished through a specific official policy or mechanism"); *Valtchev v. City of New York*,

400 F. App'x 586, 589 (2d Cir. 2010) (affirming the district court's finding that the plaintiff's

negative evaluations and disciplinary proceedings were discrete acts that did not trigger the continuing violation exception); *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, 13-CV-0243, 2014 WL 3867560, at *1 (E.D.N.Y. July 29, 2014) ("[F]ailure to accommodate is a discrete act, not a continuing violation.").  Even though Plaintiff was granted accommodations in 2007, his supervisors' and DEC's alleged failure to comply with or implement those granted accommodations acts as the functional equivalent of a denial of accommodations.  Therefore, the Court finds that each instance in which Plaintiff complained that his accommodations were not being provided and his supervisor failed to implement those accommodations resulted in a discrete denial of accommodations rather than a continuing violation related to a discriminatory policy; each of the alleged failures to implement Plaintiff's accommodations separately constituted actionable incidents.  This finding is particularly warranted when considering the lightened burden on Defendants due to Plaintiff's failure to respond to this argument.  Because the Court finds that the continuing violation doctrine does not apply, any incidents occurring before June 4, 2013, are barred by the statute of limitations.

### C.     Whether Plaintiff's Disability Discrimination Claims Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memorandum of law.  (Dkt. No. 24, Attach. 4, at 26-27, 31-33 [Defs.' Mem. of Law].)  To those reasons, the Court adds the following analysis.

Claims alleging disability discrimination are analyzed using the burden-shifting test originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  First, to establish a *prima facie* case of failure to provide reasonable accommodations, a plaintiff must demonstrate

that (a) plaintiff is a person with a disability under the meaning of the ADA, (b) an employer

covered by that statute had notice of his disability, (c) with reasonable accommodation, plaintiff

could perform the essential functions of the job at issue, and (d) the employer has refused to

make such accommodations.  *McMillan* , 711 F.3d at 125-26.  The plaintiff "'bears the burdens

of both production and persuasion as to the existence of some accommodation that would allow

[him] to perform the essential functions of his employment.'" *Id.* (emphasis in original).

However, once a plaintiff suggests plausible accommodations, "the burden of proof shifts to the

defendant to demonstrate that such accommodations would present undue hardships and

therefore would be unreasonable." *Id.* at 128.[25]

### 1.    Whether Plaintiff Has a Disability Under the Applicable Law

After careful consideration, the Court answers this question in the affirmative for the

reasons stated in Plaintiff's opposition memorandum of law.  (Dkt. No. 30, at 16-17 [Pl.'s Opp'n

Mem. of Law].)  To those reasons, the Court adds the following analysis.

Pursuant to the ADA, the term "disability" means, with respect to an individual, the

following: (a) "a physical or mental impairment that substantially limits one or more major life

activities of [the] individual;" (b) "a record of such impairment;" or (c) "being regarded as

having such an impairment."  42 U.S.C. § 12102(1).  Major life activities include, but are not

limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,

walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating,

---

[25]    The Second Circuit has noted that a claims of disability discrimination under the
NYHRL and Section 504 are governed by the same standards as ADA claims (with the exception
of a broader definition of disability in the NYHRL, as noted below).  *Dean v Univ. at Buffalo
Sch. of Medicine & Biometrical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015);.*Graves v. Finch Pruyn
& Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).

thinking, communicating, . . . working," and "operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  42 U.S.C. § 12102(2).  "'In assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments that merely affect major life activities from those that substantially limit those activities.'"  *Troeger*, 523 F. App'x at 852.[26]  Additionally, when determining whether an impairment substantially limits a major life activity, courts should consider factors such as (a) the nature and severity of the impairment, (b) the duration or expected duration of the impairment, and (c) the long-term impact of the impairment.  *Hensel v. City of Utica*, 15-CV-0374, 2016 WL 1069673, at *8 (N.D.N.Y. Mar. 16, 2016) (Kahn, J.)

Defendants argue that Plaintiff's diabetes does not constitute a disability under the ADA because, rather than alleging that his diabetes interferes with his ability to perform work, Plaintiff alleges that his work schedule interferes with his diabetes-care regimen.  (Dkt. No. 24, Attach. 4, at 20-21 [Defs.' Mem. of Law].)[27]  However, Defendants argument misses the mark. Whether or not Plaintiff's diabetes substantially interferes with his specific ability to work is not the relevant inquiry, but rather whether it substantially interferes with any major life activity.

---

[26]    The NYHRL defines disability more broadly as "a physical, mental, or medical impairment resulting from anatomical, physiological, genetic, or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."  *Karam v. Cnty of Rensselaer, New York*, 2016 WL 51252, at *17 (N.D.N.Y. Jan. 4, 2016) (D'Agostino, J.) (quoting N.Y. Exec. L. § 292[21]). Notably, the NYHRL does not require the impairment to substantially limit a major life activity as required by the ADA.

[27]    Defendants do not argue that Plaintiff's learning disability or hearing impairment are not disabilities under the ADA or NYHRL definitions.  (Dkt. No. 24, Attach. 4, at 19-21 & n.7 [Defs.' Mem. of Law].)

The admissible evidence of record establishes that Type I diabetes substantially limits Plaintiff's endocrine functioning, resulting in the need to check his glucose levels and take insulin multiple times per day and the need to adopt other maintenance methods such as exercise and food regulation in order to ensure his blood glucose levels do not become dangerously or life-threateningly high or low. Plaintiff has therefore met his burden to show that his diabetes qualifies as a disability.[28] Additionally, as noted previously, the definition of disability in the NYHRL is even broader that the aforementioned definition in the ADA and Defendants do not specifically argue that Plaintiff does not have a disability under the NYHRL. The Court therefore finds that Plaintiff has met his burden to show the existence of disabilities under both the ADA and the NYHRL standards.

### 2. Whether DEC Had Notice of Plaintiff's Disabilities

Because Defendants do not appear to contest this element, the Court will discuss it only briefly. (Dkt. No. 24, Attach. 4, at 18-30 [Defs.' Mem. of Law].) As noted above in Part I.B of this Decision and Order, it is undisputed that Plaintiff requested and was granted accommodations related to his diabetes and hearing impairment in 2007, and that he requested accommodations related to his learning disorder (as that impairment affected his writing abilities) some time after Daley became his supervisor in 2012. *See supra*, at ¶¶ 25, 35, 37-39, 46, 55-57, 65-67. The evidence therefore establishes that Defendants had notice of Plaintiff's disabilities.

---

[28]    The ADA specifically states that the determination of whether an impairment is substantially limiting should be made without regard to any ameliorative effects from mitigating measures such as medication. 42 U.S.C. § 12102(4)(E). The efficacy of Plaintiff's treatments at controlling his diabetes is therefore not a relevant consideration for determining whether his diabetes is a disability.

### 3.    Whether, with Reasonable Accommodations, Plaintiff Was Able to Perform the Essential Functions of His Job as a Forester 1

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memorandum of law.  (Dkt. No. 24, Attach. 4, at 26-27, 31-33 [Defs.' Mem. of Law].)  To those reasons, the Court adds the following analysis.

Defendants argue that Plaintiff is not qualified to perform the essential job function of writing in particular, with or without a reasonable accommodation, and therefore is not a "qualified person" for the purposes of the discrimination analysis.  (Dkt. No. 24, Attach. 4, at 26-27, 31-33 [Defs.' Mem. of Law].)  Plaintiff opposes this argument by arguing that his ability to perform the essential job functions is evident from the fact that he has been employed as a Forester 1 since 2000 without any unsatisfactory evaluations until recently.  (Dkt. No. 30, at 18 [Pl.'s Opp'n Mem. of Law].)

Notably, neither party explicitly clarifies what they believe to be the essential job functions for a Forester 1 in their memoranda.  However, it is apparent from statements made by Plaintiff in his deposition and other evidence that the preparation of UMPs was a facet of the work of a Forester 1 in the type of position Plaintiff held at Ray Brook,[29] a task that included significant writing.  (Dkt. No. 24, Attach. 1, at 41:2-8, 50:21-25, 51:10-52:4 [Pl.'s Dep.]; Dkt. No. 24, Attach. 3, at 4 ¶ 12 [Alberga Decl.]; Dkt. No. 25, Attach. 1, at 47; Dkt. No. 30, Attach. 1, at 495 ¶ 8 [O'Connor Decl.].)  The Court therefore finds that, based on the admissible record

---

[29]    At his deposition, Martin testified that there are variations in job duties between different types of Forester 1 positions depending on whether they are for private forestry, state forestry, forest preserve, or easements; Martin does note that other Forester 1s in positions similar to Plaintiff's position also had to work on UMPs.  (Dkt. No. 30, Attach. 1, at 442:2-442:24 [Martin Dep.].)

evidence, the ability to write was an essential function of the Forester 1 job. *See McMillan*, 711

F.3d at 126 (noting that, when determining the essential functions of a position, "a court must

conduct 'a fact-specific inquiry into both the employer's description of the job and how the job is

actually performed in practice'"). The Second Circuit has stated that the burden for

demonstrating that Plaintiff could perform the essential functions with or without reasonable

accommodations is "not heavy: '[i]t is enough for the plaintiff to suggest the existence of a

plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'"

*McMillan*, 711 F.3d at 127.

     In this case, Plaintiff suggested a number of possible accommodations, including a

spelling and grammar check program and access to an editorial assistant to review and edit the

sentence structure, punctuation, and grammar of his writing. (Dkt. No. 24, Attach. 1, at 180:2-

182:18, 185:4-186:21, 262:4-265:3 [Pl.'s Dep.]; Dkt. No. 30, at 27-30 [Pl.'s Opp'n Mem. of

Law].) However, the admissible record evidence does not create a genuine dispute of material

fact as to whether these accommodations, even if reasonable, would allow Plaintiff to perform

the essential writing functions of a Forester 1. Plaintiff admits in his deposition testimony that

Alberga and Martin (as well as other DEC staff members on occasion) served as his editorial

assistants during the time period that Alberga was his supervisor. (Dkt. No. 24, Attach. 1, at

180:11-184:5 [Pl.'s Dep.].) Both Alberga and Martin corroborate having performed extensive

edits on Plaintiff's work. Notably, both testified at their depositions that Plaintiff's drafts needed

significantly more corrections than those drafted by other Forester 1s, a sentiment later echoed

by Daley in his April 13, 2017, affidavit (although Daley stated he refused to perform the same

extensive editing that Alberga and Martin had performed). (Dkt. No. 30, Attach. 1, at 119:6-10,

121:1-2 [Alberga Dep.]; Dkt. No. 24, Attach. 3, at 7 ¶ 18 [Alberga Decl.]; Dkt. No. 30, Attach. 1, at 441:1-16, 442:17-19 & 23-24 [Martin Dep.]; Dkt. No. 24, Attach. 5, at 5-8 ¶¶ 21-28, 38 [Daley Aff.].)  The testimony and other statements from Alberga, Martin, and Daley also establish that Alberga and Martin's review went beyond mere grammatical editing and involved them personally rewriting large portions of Plaintiff's UMP drafts.  (Dkt. No. 24, Attach. 5, at 7 ¶¶ 31-32 [Daley Aff.]; Dkt. No. 30, Attach. 1, at 444:10-11 & 17-21 [Martin Dep.]; Dkt. No. 24, Attach. 3, at 14-15 ¶ 39 & n.1 [Alberga Decl.].)

In addition to Plaintiff's supervisors' concerns and interventions related to grammar and other basic issues, those supervisors stated that Plaintiff had difficulties with other writing tasks including internal consistency of words and ideas and his ability to deal with the less concrete aspects of planning and writing a UMP, such as organizing and processing information collected during the planning process.  (Dkt. No. 24, Attach. 3, at 7 ¶ 18-19 [Alberga Decl.]; Dkt. No. 24, Attach. 5, at 5 ¶ 21, 23 [Daley Aff.]; Dkt. No. 24, Attach. 7, at ¶¶ 45-46 [Martin Decl.]; Dkt. No. 30, Attach. 1, at 132:8-19 [Alberga Dep.]; Dkt. No. 30, Attach. 1, at 366:20-367:6 [Daley Dep.].) At his deposition and in his affidavit, Daley testified that Plaintiff also displayed issues with basic sentence structure, formatting, properly referencing or introducing graphs and tables, and misquoting or failing to cite information.  (Dkt. No. 30, Attach. 1, at 366:20-367:6 [Daley Dep.]; Dkt. No. 24, Attach. 5, at 5 ¶ 21 [Daley Aff.].)  Daley also stated that, even when given edits on his written work, Plaintiff "consistently fails to properly incorporate" those edits in future drafts. (Dkt. No. 24, Attach. 5, at 6 ¶ 26, 7 ¶ 28 [Daley Aff.].)  Because the record establishes that Plaintiff's difficulties went beyond grammar and other basic writing skills, it is not apparent that access to an editorial assistant (even if reasonable) would enable Plaintiff to perform the

essential writing functions of the job. Notably, Daley stated in his affidavit that, when there had been an administrative assistant available for a time to proofread documents for foresters at the Ray Brook office, that assistant had not been expected to edit documents for "substance, organization, or consistency." (Dkt. No. 24, Attach. 5, at 8 ¶ 34 [Daley Aff.].) The evidence presented by both Plaintiff and Defendants therefore establishes that Plaintiff's difficulties with writing included deeper issues with the substantive content of the UMPs that would not be solved by review from an editorial assistant. Plaintiff does not identify any plausible accommodations that would address his need for substantial additional assistance not only with spelling, grammar, and punctuation, but with substantive analysis and consistency. Notably, to place that burden on another DEC employee (whether it be Plaintiff's supervisor or an assistant) would come dangerously close to eliminating one of the essential functions of Plaintiff's job; this is particularly true based on the evidence that Alberga and Martin had to personally rewrite substantial portions of Plaintiff's UMP drafts to make them of acceptable quality.[30] *See Davis v. New York City Health & Hosps. Corp.*, 508 F. App'x 26, 29 (2d Cir. 2013) ("The law, however, does not afford a disabled individual the right to redefine, much less eliminate, the functions of a job deemed essential by an employer.").

---

[30]    Plaintiff's argument that he is clearly able to perform the essential functions of his job because he has been performing that job for many years without significant complaint is undermined by the testimony that Alberga and Martin had been providing Plaintiff with significant assistance on his UMP drafts until 2012. Given the evidence from Daley especially that Plaintiff's drafts were significantly deficient once that assistance had been taken away, Plaintiff has not adduced evidence to create a genuine dispute of material fact as to whether he was capable of performing the essential writing functions of a Forester 1 with reasonable accommodations.

Because Plaintiff has not produced admissible evidence to establish that he can perform all of the essential functions of his job, with or without reasonable accommodations, Defendants are entitled to summary judgment on Plaintiff's claims of disability discrimination as a result of a failure to provide reasonable accommodations.[31]  *See Smythe v. Am. Red Cross Blood Servs. N.E. New York Region*, 797 F. Supp. 147, 151 (N.D.N.Y. 1992) (McCurn, C.J.) (noting that the non-movant must make a showing sufficient to establish all elements essential to its case, and that, "[i]f the non-movant fails to satisfy this initial burden, there can be no genuine issue as to any material fact because 'a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 [1986]); *see also Nick's Garage, Inc. v. Progressive Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (noting that a movant for summary judgment can meet its burden by [1] submitting evidence that negates an essential element of the non-moving party's claim, or [2] demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the claim).  The Court therefore grants Defendants' motion for summary judgement as to Plaintiff's First, Third, and Fifth Claims.

---

[31]     Because an ability to perform essential job functions with or without reasonable accommodation is also an element for adverse-action disability discrimination claims, the same rationale as set forth above applies to the portion of Plaintiff's discrimination claim based on discrimination in the form of "adverse action against him in regard to the terms, conditions, or privileges of his employment."  (Dkt. No. 1, at ¶ 134 [Compl.].)  *See also Davis v. New York City Dept. of Educ.*, 804 F.3d 231, 234-35 (2d Cir. 2015) (listing the elements of an adverse-action discrimination claim as the following: [a] the employer is subject to the ADA; [b] plaintiff is disabled within the meaning of the ADA; [c] plaintiff was otherwise qualified to perform essential job functions with or without reasonable accommodations; [d] plaintiff suffered an adverse employment action; and [e] the adverse action was imposed because of plaintiff's disability).

### D.    Whether Plaintiff's Retaliation Claims Must Be Dismissed[32]

After carefully considering the matter, the Court answers this question in the affirmative

for the reasons stated in Defendants' memorandum of law.  (Dkt. No. 24, Attach. 4, at  [Defs.'

Mem. of Law].)  To those reasons, the Court adds the following analysis.

To defeat a motion for summary judgment on a retaliation claim under the ADA, the

plaintiff must establish a *prima facie* case of retaliation by presenting evidence sufficient to

permit a rational trier of fact to find (a) he was engaged in protected activity, (b) the employer

was aware of the activity, (c) the employer took adverse action against the plaintiff, and (d) there

is a causal connection between the protected activity and the adverse action (i.e., a retaliatory

motive).  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001).  If the

plaintiff can make a *prima facie* showing of retaliation, the burden shifts to the employer to

articulate a legitimate, non-discriminatory reason for the adverse action.  *Shepheard v. New York*

*Corr. Dept.*, 360 F. App'x 249, 251 (2d Cir. 2010).  If the employer provides a legitimate, non-

discriminatory reason, the plaintiff must provide evidence demonstrating that the proffered

reason is merely a pretext for discrimination.  *Shepheard*, 360 F. App'x at 251.[33]

---

[32]    The dismissal of Plaintiff's discrimination claims does not preclude him from
obtaining relief on his claims for retaliation.  This Court and the Second Circuit have previously
found that "'a plaintiff need not establish that the conduct opposed was actually a violation of the
of the [ADA] so long as he can establish that he possessed a good faith, reasonable belief that the
underlying challenged actions of the employer violated the law.'"  *Brady v. Dammer*, 573 F.
Supp. 2d 712, 721 (N.D.N.Y. 2008) (Kahn, J.) (quoting *Sarno v. Douglas Elliman-Gibbons &*
*Ives, Inc.*, 183 F.3d 155, 159 [2d Cir. 1999]).

[33]    Retaliation claims pursuant to Section 504 and the NYHRL are governed by the
same standards as ADA retaliation claims.  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d
Cir. 2002).

The parties do not appear to dispute that Plaintiff's pursuit of accommodations in the workplace was a protected activity or that the Defendants were aware of this activity; the evidence as a whole overwhelmingly establishes that the DEC, Martin, Alberga, and Daley were all aware that Plaintiff (a) had requested accommodations, (b) been granted certain accommodations in 2007, and (c) continued to subsequently allege that his accommodations were not being provided through the relevant time period.  *See Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 313 (S.D.N.Y. 2003) ("The ADA prohibits retaliation against any individual who asserts rights under the ADA . . . [including] when they seek a reasonable accommodation for their disability.").  These first two elements are therefore met.

Regarding the third element, an adverse action is defined as one that causes a "materially adverse change in the terms, privileges, duration, and conditions of employment" that  "would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Treglia*, 313 F.3d at 720; *Brady*, 573 F. Supp. 2d at 722 (quoting *Burlington N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 [2006]).  Materially adverse actions can include "termination of employment, a demotion evidenced by a decreased in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities." *Brady*, 573 F. Supp. 2d at 722 (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 151 [2d Cir. 2006]).

In the Complaint, Plaintiff alleges that the Defendants retaliated against him for efforts to achieve compliance with his granted accommodations and his filing of the EEOC charge by (a) refusing to provide reasonable accommodations, (b) altering the terms, conditions, and privileges of his employment, (c) issuing disciplinary counseling memoranda and unsatisfactory or negative performance evaluations, and (d) failing to promote him to Forester 2 on multiple

41

occasions.  (Dkt. No. 1, at ¶¶ 140-142, 157-59, 174-76, 178-79 [Compl.].)  In his opposition

memorandum of law, Plaintiff argues more specifically that (a) Daley issued a counseling memo

in July 2013 restricting Plaintiff from using chainsaws and other motorized equipment a week

after Plaintiff reminded Daley that failure to allow him more outdoor work assignments was a

violation of the accommodations granted in 2007, (b) Daley "falsely accused" Plaintiff of

insubordination in December 2013, which resulted in further restriction of Plaintiff's outdoor

activities, and (c) Defendants failed to promote Plaintiff.  (Dkt. No. 30, at 23, 30-32 [Pl.'s Opp'n

Mem. of Law].)

     The Second Circuit and other courts within this circuit have found that allegations of

actions such as failure to promote and negative performance reviews that cause an adverse

change in work conditions can constitute adverse actions.  *Treglia*, 313 F.3d at 720; *Zavala v.

Cornell Univ.*, 9 F. Supp. 213, 219 (N.D.N.Y. 2014) (Kahn, J.).  The Court need not decide

whether the actions identified in Plaintiff's opposition memorandum of law are adverse actions

causally connected to Plaintiff's requests for accommodations, because, even if Plaintiff can

establish a *prima facie* case of retaliation, the evidence establishes that there were legitimate,

non-discriminatory reasons for those actions that Plaintiff has not shown to be merely a pretext

for retaliation.

     Regarding the July 2013 counseling memorandum and Plaintiff's subsequent loss of

chainsaw and motorized equipment privileges, the evidence as a whole establishes that these

actions occurred as a result of concerns that Daley had about Plaintiff's conduct and safety.  In

his declaration, Daley stated that, in July 2013, he learned that Plaintiff had been cutting

standing tress on two occasions while alone and without DEC dispatch knowing his

whereabouts, noting that Foresters are required to inform DEC dispatch when they are doing fieldwork as part of safety protocol; he stated that this violation of safety protocol was the reason for prohibiting Plaintiff from using chainsaws. (Dkt. No. 24, Attach. 5, at ¶¶ 45-48, 81 [Daley Decl.]; Dkt. No. 24, Attach. 5, at 41-42, 48, 70, 72.) Plaintiff stated in both his EEOC charge and his declaration that the reason provided to him by Daley for restricting his chainsaw use was that "it was unsafe, especially since [Plaintiff is] a diabetic," and that Daley used Plaintiff's arguing with Daley about his chainsaw use as the basis for restricting him from using motorized equipment. (Dkt. No. 30, Attach. 1, at 483 ¶¶ 54-56 [Pl.'s Decl.]; Dkt. No. 25, Attach. 2, at 52-53 [EEOC Charge].) Although Plaintiff alleges that Daley was incorrect in stating he had been alone or that no one had known where he was while he was using the chainsaw,[34] he does not provide any evidence that Daley's reasons related to safety were a pretext for a retaliatory motive.[35] Notably, Plaintiff has produced no evidence showing that (a) the safety protocol referenced by Daley does not exist, or (b) that Plaintiff in fact complied with that protocol. The mere fact that the counseling memorandum was issued approximately a week after Plaintiff discussed his outdoor-work accommodations with Daley does not by itself establish a retaliatory

---

[34]    Notably, although Plaintiff focuses his argument on whether protocols allow DEC employees to use chainsaws when alone and whether he was properly trained to do so, this argument does not address Daley's rationale for the counseling memorandum, which was Plaintiff's failure to inform DEC dispatch of his whereabouts in violation of the safety protocol. Therefore, even if Plaintiff is correct that the landowner was there when he was using the chainsaw and that he informed Daley of his intended activity before going out, such statements do not address Daley's specific concern with Plaintiff's failure to inform DEC dispatch as required by safety protocol.

[35]    Even if Daley did tell Plaintiff that chainsaw use was unsafe "especially because [he is] diabetic," this statement does not establish or even suggest retaliatory motive, and Plaintiff's claims of adverse-action disability discrimination have been dismissed on other grounds as discussed above in Part III.C of this Decision and Order.

motive.  Plaintiff has not shown a genuine dispute of material fact as to whether Defendants'

reasons for limiting chainsaw and motorized equipment use was merely a pretext for

discrimination.  *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585-86 ("[The non-movant]

must do more than simply show that there is some metaphysical doubt as to the material facts.").

Regarding Plaintiff's allegations as to the December 2013 incident and subsequent

activity restrictions, the evidence as a whole establishes that discipline for this incident was

related to Plaintiff's failure to comply with Daley's orders.  Namely, Daley stated that Plaintiff

suffered an accident while scouting potential facilities in deep snow, despite the fact that Daley

had "specifically told him not to do so."  (Dkt. No. 24, Attach. 5, at 10 ¶ 49 [Daley Decl.]; Dkt.

No. 24, Attach. 5, at 236, 245-46.)  Due to Daley's concerns about Plaintiff's failure to

"understand directions and use proper judgment," Daley directed him to refrain from any

fieldwork unless approved by Daley.  (Dkt. No. 24, Attach. 5, at ¶¶ 50-52, 61, 81 [Daley Decl.];

Dkt. No. 24, Attach. 5, at 50, 53, 61-63.)  In his deposition, Plaintiff testified that, from the end

of 2013 to June 2016, he was not able to leave the office without Daley's permission.  (Dkt. No.

24, Attach. 1, at 148:25-149:7 [Pl.'s Dep.].)  Plaintiff argues that Daley's assertion that he

violated orders was false, and asserts that Daley had changed the substance of his directions

when justifying imposing activity restrictions on Plaintiff.[36]  However, the relevant emails show

that, although Daley's response email was less clear than it could have been, Plaintiff

---

[36]        Plaintiff argues that Daley had instructed him not to scout new trail locations in
his initial email, and subsequently changed it to an instruction not to scout proposed facility
locations in an email after Plaintiff had gone out to inventory an existing logging road and tent
site.  (Dkt. No. 30, at 24 [Pl.'s Opp'n Mem. of Law].)

acknowledged that Daley had told him not to inventory the lands or the facilities on the lands.[37]

Plaintiff therefore has not shown that there is a genuine dispute of material fact as to whether

Daley's use of Plaintiff's failure to follow instructions as a basis for restricting his independent

outdoor activities was merely a pretext for retaliation.

Regarding Plaintiff's allegations that Defendants failed to promote him to Forester 2 in

retaliation for seeking compliance with his granted accommodations, various sources have

provided legitimate, non-discriminatory reasons for the failure to promote.  In his declaration,

Alberga listed multiple factors that he considers when determining whether to promote a

Forester 1 and stated that "[a] candidate's score on a civil service examination or the amount of

years employed by the [DEC] are not determinative factors when hiring a Forester 2."  (Dkt. No.

24, Attach. 3, at ¶¶ 43-46 [Alberga Decl.].)  In his declaration, Martin stated that, while the DEC

is required to offer interviews to the three applicants with the highest civil service examination

scores, those scores are not determinative for any other purpose in the interview and hiring

process.  (Dkt. No. 24, Attach. 7, at ¶ 52 [Martin Decl.].)  Martin stated that the candidates who

ultimately received the positions Plaintiff applied and interviewed for were chosen based on

factors including more relevant experience, better answers to the standard interview questions,

better ideas, or better qualifications and/or relevant skills.  (*Id.* at ¶¶ 55-56, 59, 61, 63.)

---

[37]      In Plaintiff's initial email seeking confirmation of Daley's instructions given at a
meeting the previous day, Plaintiff noted that Daley had required him to cancel "field visits to
familiarize myself with the lands," and that he understood Daley's instruction to be that "I
should not inventory the lands or the facilities on the lands."  (Dkt. No. 30, Attach. 1, at 503.)
Plaintiff's statements indicate that, although Daley specifically addressed only scouting trail
locations in his response email to Plaintiff, there had been a conversation between Daley and
Plaintiff in which Daley instructed Plaintiff not to conduct field visits or inventory the lands or
facilities in the deep snow, and Plaintiff was aware of those instructions.  (*Id.* at 501-03.)

Defendants Alberga, Martin, and Daley have also all stated that they have never been consulted or asked about their opinions of Plaintiff's qualifications or other aspects of his performance in relation to interviews in which they did not personally participate. (Dkt. No. 24, Attach. 3, at ¶ 48 [Alberga Decl.]; Dkt. No. 24, Attach. 5, at ¶ 121 [Daley Decl.]; Dkt. No. 24, Attach. 7, at ¶¶ 67-69 [Martin Decl.].) Indeed, individuals who conducted interviews for Forester 2 positions outside of Region 5 (where Plaintiff's Ray Brook job is located) stated in declarations that they did not recall having any communication with Martin, Alberga, or Daley about Plaintiff; they also stated that Plaintiff was not chosen because the successful candidates had more extensive and/or relevant experience. (Dkt. No. 24, Attach. 9, at ¶¶ 5-8 [Schongar Decl.]; Dkt. No. 24, Attach. 11, at ¶¶ 5-8 [Smith Decl.]; Dkt. No. 24, Attach. 12, at ¶¶ 5-8 [Sinclair Decl.]; Dkt. No. 24, Attach. 13, at ¶¶ 5-8 [Messenger Decl.].)[38] Additionally, Sherri Montross, Assistant Director of Personnel for the DEC, stated in her declaration that "[n]o one outside an employee's chain of command and Human Resources staff has access to their performance evaluations for any purpose" and that "this information was not available to interviewers" considering Plaintiff for Forester 2 promotions in other DEC regions. (Dkt. No. 24, Attach. 6, at ¶¶ 13, 19 [Montross

---

[38]    Plaintiff states that, "[a]s a matter of course, managers speak with at least one current or former manager of a job applicant for a professional position, especially when a manager holds a parallel position as the applicant's supervisor in the same agency." (Dkt. No. 30, at 32 [Pl.'s Opp'n Mem. of Law].) However, Plaintiff fails to cite any authority or evidence to support this statement. Without evidence to establish that any of the interviewers outside of Region 5 spoke with or otherwise received information about Plaintiff from Martin, Alberga, or Daley, Plaintiff argument that those interviewers were influenced by negative comments from Plaintiff's supervisors must fail. A notation in the Smith Declaration that the successful candidate for one position had been highly recommended by his supervisors does not establish that Smith spoke to Plaintiff's supervisors, particularly because Smith also stated he did not recall having any communication with Plaintiff's supervisors. (Dkt. No. 24, Attach. 11, at ¶¶ 5-8 [Smith Decl.].)

Decl.].)  Given this evidence, Plaintiff's conclusory assertions that Martin, Alberga, and Daley sabotaged his promotion efforts do not create a genuine dispute of material fact as to whether Defendants' reasons for failing to promote him were merely a pretext for retaliation.  *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585-86

Additionally, to the extent that Plaintiff argues that Daley reduced his outdoor work assignments in general as an act of retaliation for seeking compliance with his granted accommodations, evidence from multiple sources establishes that Plaintiff was required to spend more time working on certain UMPs due to changing priorities in the mission of DEC that were unrelated to Plaintiff, namely an increase in the priority to get those specific UMPs completed based on policy considerations made by the DEC.  (Dkt. No. 24, Attach. 3, at ¶ 41 [Alberga Decl.]; Dkt. No. 24, Attach. 5, at ¶ 59, 81 [Daley Decl.]; Dkt. No. 24, Attach. 5, at 39, 44; Dkt. No. 24, Attach. 7, at ¶¶ 34-35 [Martin Decl.].)  Additionally, Daley stated that, as Plaintiff's supervisor, he had found that Plaintiff engaged in unsafe work practices and poor judgment and had a limited understanding of basic forestry principles; these observations contributed to Daley's decision to decrease Plaintiff's ability to work with motorized equipment or to leave the office to do fieldwork without first seeking permission.  (Dkt. No. 24, Attach. 5, at 4 ¶¶ 17, 39, 41, 45-47, 50, 54 [Daley Decl.].)  Plaintiff's arguments that Defendants' reasons for decreasing his outdoor work were pretexts for retaliation because other Forester 1s completed outdoor work in the winter and because he was assigned more UMPs with more stringent deadlines than other Forester 1s are not persuasive because they do not refute Defendants' legitimate, non-discriminatory reasons related to Plaintiff's failure to follow instructions (which had resulted in an injury when Plaintiff was out in deep snow in December 2013) and the changing priorities of

the DEC related to which UMPs needed to be given priority; because the reasons proffered by Defendants were related to Plaintiff's actions and the specific UMPs Plaintiff was assigned (in some cases, he had been assigned these UMPs a significant amount of time before further reductions in outdoor work occurred in 2013), whether other Forester 1s were able to do fieldwork in the winter and whether they had less strict deadlines on UMPs does not create a genuine dispute of material fact as to whether Defendants' proffered reasons were merely a pretext for retaliation.  (Dkt. No. 30, at 19-22, 30-31 [Pl.'s Opp'n Mem. of Law].)

For all of the above reasons, Plaintiff cannot establish a genuine dispute of material fact about whether Defendants' legitimate, non-discriminatory reasons for reducing Plaintiff's outdoor work and failing to promote him to Forester 2 were merely pretexts for retaliation.  The Court therefore finds that Defendants are entitled to summary judgment on Plaintiff's Second, Fourth, and Sixth Claims.  *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 209-210 (E.D.N.Y. 2009).

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for sanctions (Dkt. No. 32) is **DENIED** as moot; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 24) is **GRANTED** in its entirety: and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

Dated: March 22, 2018
     Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge